UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| RAYMOND MORRISSEY, )<br>)<br>*Plaintiff,* )<br>)<br>v. )<br>)<br>WEBSTER BANK, N.A., )<br>)<br>*Defendant.* )<br>) | Civil Action No. 05-10984-WGY |

## DECLARATION OF HOBART F. POPICK

I, Hobart F. Popick, hereby depose and say as follows:

1.　I am a resident of the Commonwealth of Massachusetts. I am over the age of 18 and believe in the obligations of an oath.

2.　I am an attorney with the law firm Day, Berry & Howard LLP, One International Place, Boston, Massachusetts, 02110. I represent the Defendant, Webster Bank, N.A. ("Webster") in this matter.

3.　This affidavit is made in support of and submitted in conjunction with Defendant Webster Bank, N.A.'s Motion for Summary Judgment.

4.　The attachments hereto consist of two letters and a Joint Press Release.

5.　The document attached hereto as Exhibit A is a letter dated June 14, 2005 that I received via certified mail from counsel for the plaintiff.

6.　The document attached hereto as Exhibit B is a Joint Press Release dated September 1, 2005, which I accessed on October 28, 2005 at the Internet web site of the Board of Governors of the Federal Reserve System at: http://www.federalreserve.gov/boarddocs/press/bcreg/2005/20050901/default.htm.

-2-

7.  The document attached hereto as Exhibit C is a letter dated from the Consumer Bankers Association addressed to Jennifer J. Johnson, Secretary, Board of Governors of the Federal Reserve System, which I accessed on October 28, 2005 at the Internet web site of the Federal Reserve Board at:  http://www.federalreserve.gov/SECRS/2005/October/20051013/R-1234/R-1234_17_1.pdf.

ON THIS 31st DAY OF OCTOBER, 2005, I, HOBART F. POPICK, HEREBY DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

_____
Hobart F. Popick

# EXHIBIT A



*FROM THE OFFICE OF THE*
# FAMILY AND CONSUMER LAW CENTER

*WWW.RICONSUMERLAW.COM*
CLAUDE F. LEFEBVRE
CHRISTOPHER M. LEFEBVRE, P.C.
*ATTORNEYS & COUNSELORS AT LAW*

June 14, 2005

**CERTIFIED MAIL**

Webster Bank NA
c/o: Hobart F. Popick, Esq.
Day, Berry & Howard LLP
260 Franklin Street
Boston, MA 02110-3179

        Re: Raymond Morrissey v Webster Bank, N.A. ( C.A. No 05-10984)

Dear Mr. Popick:

        I am writing to you in your capacity as attorney for Webster Bank N.A. Based on your letter to me dated June 13, 2005 I assume that Webster Bank has received a copy of the federal court Complaint filed in Boston.

        Mr. Morrissey contends that the allegations referenced in said complaint also violate Mass. G.L., ch. 93A, and he hereby gives notice as required by that statute.

        Mr. Morrissey contends that a reasonable resolution of the 93A claim would be payment of $20 per Massachusetts class member.

        ". . . Any person receiving such a demand for relief who, within thirty days of the mailing or delivery of the demand for relief, makes a written tender of settlement which is rejected by the claimant may, in any subsequent action, file the written tender and an affidavit concerning its rejection and thereby limit any recovery to the relief tendered if the court finds that the relief tendered was reasonable in relation to the injury actually suffered by the petitioner. In all other cases, if the court finds for the petitioner, recovery shall be in the amount of actual damages or twenty-five dollars, whichever is greater; or up to three but not less than two times such amount if the court finds that the use or employment of the act or practice was a willful or knowing violation of said section two or that the refusal to grant relief upon demand was made in bad faith with knowledge or reason to know that the act or practice complained of violated said section two. For the purposes of this chapter, the amount of actual damages to be multiplied by the court shall be the amount of the judgment on all claims arising out of the same and underlying transaction or occurrence, regardless of the existence or nonexistence of insurance coverage available in payment of the claim. In

addition, the court shall award such other equitable relief, including an injunction, as it deems to be necessary and proper. The demand requirements of this paragraph shall not apply if the claim is asserted by way of counterclaim or cross-claim, or if the prospective respondent does not maintain a place of business or does not keep assets within the commonwealth, but such respondent may otherwise employ the provisions of this section by making a written offer of relief and paying the rejected tender into court as soon as practicable after receiving notice of an action commenced under this section. . . ."

Sincerely,

Christopher M. Lefebvre

cc: Raymond Morrissey

# EXHIBIT B



# The Federal Reserve Board

**Joint Press Release**

Board of Governors of the Federal Reserve System
Conference of State Bank Supervisors
Federal Deposit Insurance Corporation
National Credit Union Administration
Office of the Comptroller of the Currency
Office of Thrift Supervision

For Immediate Release                                              September 1, 2005

### Agencies Encourage Insured Depository Institutions to Assist Displaced Customers

The Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the National Credit Union Administration, the Office of the Comptroller of the Currency, and the Office of Thrift Supervision (the agencies), and the Conference of State Bank Supervisors are asking insured depository institutions to consider all reasonable and prudent steps to assist customers' and credit union members' cash and financial needs in areas affected by Hurricane Katrina. The agencies are working with state regulatory agencies, financial industry trade groups, and affected financial institutions to identify customer needs and monitor institutions' restoration of services.

The agencies remind the public that deposit insurance is in full force and that money in FDIC- or NCUA-insured accounts is protected by federal deposit insurance. The agencies also note that a priority is to provide customer access to deposit accounts and other financial assets. Many financial institutions are implementing contingency plans, including procedures for consumers to have access to ATMs and use of their debit cards.

The financial services community through its various trade associations is working together to assist affected institutions. The agencies encourage financial institutions to assist affected institutions and consider all reasonable and prudent actions that could help meet the critical financial needs of their customers and their communities. To the extent consistent with safe and sound banking practices, such actions may include:

- Waiving ATM fees for customers and non-customers
- Increasing ATM daily cash withdrawal limits
- Easing restrictions on cashing out-of-state and non-customer checks
- Waiving overdraft fees as a result of paycheck interruption
- Waiving early withdrawal penalties on time deposits
- Waiving availability restrictions on insurance checks
- Allowing loan customers to defer or skip some payments
- Waiving late fees for credit card and other loan balances due to interruption of mail and/or billing statements or the customer's inability to access funds
- Easing credit card limits and credit terms for new loans
- Delaying delinquency notices to the credit bureaus

The agencies, in consultation with FinCEN, also encourage depository institutions to be reasonable in their approach to verifying the identity of individuals temporarily displaced by Hurricane Katrina. Under the Customer Identification Program requirement of the Bank Secrecy Act, depository institutions must obtain, at a minimum, an individual's name, address, date of birth and taxpayer identification number or other acceptable identification

number before opening an account. The Customer Identification Program requirement provides depository institutions with flexibility to design a program that uses documents, non-documentary methods, or a combination to verify a customer's identity. Moreover, the regulation provides that verification of identity may be completed within a reasonable time after the account is opened. Recognizing the urgency of this situation, the agencies encourage depository institutions to use non-documentary verification methods for affected customers that may not be able to provide standard identification documents, as permitted under the regulation. A depository institution in the affected area, or dealing with new customers from the affected area, may amend its Customer Identification Program immediately and obtain required board approval for program changes as soon as practicable.

The agencies note that these measures could help customers recover their financial strength and contribute to the health of the local community and the long-term interest of financial institutions and their customers when undertaken in a prudent manner. The agencies recognize that the needs and situation of each financial institution and its community and customers are unique. The actions above may not be feasible or desirable for all institutions and many institutions may provide additional services from those identified.

The agencies will continue to monitor closely the situation and needs of insured depository institutions and their customers and will provide additional guidance, as required, to help address those needs. Institutions in need of assistance in dealing with customers affected by the hurricane should contact their primary supervisors.

###

**Media Contacts:**

| | | |
|---|---|---|
| Federal Reserve | David Skidmore | (202) 452-2955 |
| CSBS | Mary White | (202) 728-5715 |
| FDIC | David Barr | (202) 898-6992 |
| NCUA | pacamail@ncua.gov | or call (703) 518-6330 |
| OCC | Kevin Mukri | (202) 874-5770 |
| OTS | Chris Smith | (202) 906-6677 |

2005 Banking and consumer regulatory policy

# EXHIBIT C



Jennifer J. Johnson
Secretary
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551

RE: Regulation E; Docket No. R-1234

Dear Ms. Johnson:

The Board of Governors of the Federal Reserve System (the "Board") has published for comment a proposal to amend Regulation E and the related commentary to clarify the disclosure obligations of automated teller machine ("ATM") operators with respect to fees imposed on a consumer for initiating an electronic fund transfer or a balance inquiry at an ATM. The Consumer Bankers' Association ("CBA")[1] appreciates this opportunity to respond to the Board's request for comment. CBA strongly supports the proposal, for the reasons and with the few concerns discussed below.

1. Overview

Many CBA members are broadly engaged in providing electronic payment systems and services, and we therefore want to ensure that consumer protections relating to those systems and services are both effective and logical. We believe it essential that ATM disclosure requirements under Regulation E should be imposed and implemented in a thoughtful, rational way to avoid unnecessary burden to the ATM operators and unnecessary confusion to consumers.

Much debate has surrounded the exact language required to be on the physical signage posted on ATMs in order to inform customers of any fees that may be assessed by the ATM operator for transactions or balance inquiries initiated at the ATM. The Board issued a proposed clarification to the official staff commentary on this issue in September 2004. The current proposal would withdraw that proposed clarification to the commentary and substitute a similar clarification via an amendment to Regulation E and the related commentary.

The Board's current proposal would amend Section 205.16 of Regulation E to recognize explicitly that the Section provides some flexibility in the language of the signage if fees are

---

[1] The Consumer Bankers Association is the recognized voice in retail banking issues in the nation's capital. Member institutions are the leaders in consumer financial services, including auto finance, home equity lending, card products, education loans, small business services, community development, investments, deposits and delivery. CBA was founded in 1919 and provides leadership, education, research and federal representation on retail banking issues such as privacy, fair lending and consumer protection legislation/regulation. CBA members include most of the nation's largest bank holding companies as well as regional and super community banks that collectively hold two-thirds of the industry's total assets.

imposed only in some, but not all, instances. Specifically, the proposal would allow for signage indicating that a fee "will be imposed" even though it will not be in some transactions. Alternatively, under the proposal, ATM operators may post signage that a fee "may be imposed" if there are circumstances in which a fee will not be imposed at that ATM. Further, the proposal provides that no ATM fee disclosure signage is required if fees are never assessed by the operator of the ATM, and that signage indicating that a fee "will be imposed" must be used if such fees are always assessed.

For the reasons detailed below, the Consumer Bankers Association believes that the Board's proposal should be adopted to put an end to any existing ambiguity as to the disclosure requirements of ATM operators.

This letter will initially summarize the position of the Consumer Bankers Association on the proposal, then set forth some background and history in support of the proposal and, finally, will address specific questions posed by the Board in its request for comment.

2. Summary of the Consumer Bankers Association's Position

Regulation E currently requires that an ATM operator that does not hold the account of the consumer to or from which a transfer is made and that imposes a fee on a consumer for initiating an electronic fund transfer or a balance inquiry must provide signage on the ATM indicating that a fee "will" be imposed for providing electronic fund transfer services or a balance inquiry. ATM operators typically charge some ATM users a fee but not others. Hence, too literal an application of the Regulation E requirement would result in an inaccurate disclosure; a disclosure that a fee will be imposed on customers on whom no fee will, in fact, be imposed.

Our position of support for the proposal rests ultimately on a simple proposition in which we assume the Board concurs. **That is, consumer disclosures should be accurate, and not distorted representations of transaction costs.** Or more simply, the disclosure should be truthful, not misleading. In this instance, the core issue is whether a semantic choice of words in the current regulation ("will") should be retained even where it is clearly inaccurate. We find it impossible to believe that there is consumer benefit, or any other justification, for a mandatory disclosure that is patently wrong. We urge the Board to cut through the semantic fog of this debate, and clarify the disclosure rule in a way that passes the test of common sense.

3. Background of industry ATM disclosure practices

Well before adoption of Section 205.16, major segments of the industry began providing disclosures at ATMs that were both accurate and fully protective of consumers. Such disclosures alerted consumers through signage that a fee "may" be imposed, followed by a precise, individualized on-screen disclosure stating whether a fee will be imposed and the amount of the fee. Such disclosures continue to be made today. It is important to both the banking industry and consumers that the Board's proposal be adopted as a clarification of existing law to recognize explicitly the appropriateness of the ATM signage disclosure practice.
.
   A. Early Regulation E's ATM signage requirement

In fact, industry ATM disclosure practices have evolved in advance of, and were more protective of consumers than, the black-letter law. Effective May 1, 1980, Section 205.9(a)(1) of Regulation E was amended to require any ATM operator charging a fee to

2

disclose "the amount of the charge . . . on a sign posted on or at the terminal." In 1996 Regulation E was subject to extensive revisions. The relevant language of the transaction fees disclosure in Section 205.9(a)(1) was amended only slightly, however, to require disclosure of "the amount of the fee . . . on or at the terminal." The Commentary accompanying the 1996 revisions further explained the transaction fee disclosure requirements as follows:

> The required display of a fee amount on or at the terminal may be accomplished by displaying the fee on a sign at the terminal <u>or</u> on the terminal screen for a reasonable duration. Displaying [a] fee on a screen provides adequate notice, as long as consumers are given the option to cancel the transaction after receiving notice of a fee.

Comment 9(a)(1)-1; 61 Fed. Reg. 19,690 (May 2, 1996). [emphasis added]

B. <u>Networks implement more consumer-friendly disclosure rules than Regulation E requires</u>

Several years prior to the 1996 revisions of Regulation E, out of a desire to provide full and accurate disclosure of surcharges as well as an opportunity for customers to avoid such fees, many ATM systems included more extensive disclosure requirements in their operating rules than were mandated by federal law. For example, in 1989, one of the country's largest ATM networks (the "Network") implemented the following operating rule provisions:

> FEE NOTICE REQUIREMENTS FOR SURCHARGE
>
> If an ATM Member or Affiliate imposes a Surcharge for the use of its ATMs, the ATM Member or Affiliate must post the following notice of such Surcharge on the ATM or the ATM surround in a location that is clearly visible and conspicuous to the Cardholder while using the ATM . . .
>
> [Full name of the institution that imposed the Surcharge] *may* charge a fee for withdrawing cash. This fee is added to the amount of your withdrawal and is in addition to any fees that may be charged by your financial institution. (Emphasis supplied).

In addition, the Network rules also required that:

> the Cardholder must be given on-screen notice that such Surcharge/Rebate is being applied, on-screen notice of the amount or percentage of such Surcharge/Rebate, and an option to continue or cancel the Transaction.

Note that the Network rules required *both* signage at the ATM *and* on-screen disclosure while the 1996 Regulation E rule, in contrast, required *either* signage *or* a screen display. Although not yet legally required to do so, the Network determined by 1989 that cardholders should be given notice of the possibility of surcharges on ATM signage *in addition to* explicit

3

on-screen disclosure of any applicable fees. Such disclosures went well beyond the Regulation E requirements at that time and pre-dated the adoption of Section 205.16 by twelve years.

C. The Gramm-Leach-Bliley Act

New statutory surcharge disclosure requirements were created in 1999 through the passage of the Gramm-Leach-Bliley Act ("GLBA"). It is notable that the sponsor of the ATM fee disclosure bill that was incorporated into GLBA stated formally and publicly that it was her intent to protect consumers by statutorily mandating then-existing industry practices. Chairwoman of the House Banking Committee Financial Institutions Subcommittee and sponsor of the ATM disclosure bill, Marge Roukema, stated that:

> Federal Reserve regulations and industry rules already require that surcharges be disclosed. This bill simply puts existing practice into law. Since agency regulations and industry rules are subject to change, this sets a uniform standard that consumers will be able to count on.[2]

Passage of the GLBA resulted in a new section 205.16 to Regulation E, effective October 1, 2001. That section provides in relevant part:

§205.16—Disclosures at automated teller machines . . .

(b) *General.* An automated teller machine operator that imposes a fee on a consumer for initiating an electronic fund transfer or a balance inquiry shall—

(1) Provide notice that a fee will be imposed for providing electronic fund transfer services or a balance inquiry; and

(2) Disclose the amount of the fee.

(c) *Notice requirement.* An automated teller machine operator must comply with the following:

   *(1)* *On the machine.* Post the notice required by paragraph (b)(1) of this section in a prominent and conspicuous location on or at the automated teller machine; and
   *(2)* *Screen or paper notice.* Provide the notice required by paragraphs (b)(1) and (b)(2) of this section either by showing it on the screen of the automated teller machine or by providing it on paper, before the consumer is committed to paying a fee.

Despite the Board's clarification, the regulatory language could, but should not, be read literally to require signage stating that a fee "will" be charged in all instances, unless no fee were ever charged. If so interpreted, however, it would have changed "industry

---

[2] Rep. Roukema's statement is cited in Part III of the Board's proposal.

4

practice," rather than reflected them. Much worse, as pointed out by the Board[3], such a statement will rarely be factually correct. Rather, the more accurate disclosure pattern set by many of the leading ATM systems in the U.S., and used by many major ATM operators, as noted by the disclosure fee bill's sponsor, alerts consumers that a fee "may" be charged. This initial alert is followed within seconds by an explicit on-screen disclosure tailored to the identity of the consumer and the specific nature of the transaction.

D. <u>Integration of multiple ATM fee disclosures</u>

    Some might suggest that the Board's current proposal is objectionable because the permitted "may" disclosure is inconclusive and uncertain. There are two responses. One is that in every case the customer will see an on-screen statement of any applicable fee before committing to the transaction. The other response is that ATM transaction fees are subject to disclosure under Regulation E at no less than four different levels of the customer-bank account relationship.

    <u>Initial Disclosure by Issuer</u>—The ATM card issuing institution is obligated to provide notice, as part of its initial disclosure upon the opening of an account, that a fee may be imposed by an ATM operator that does not hold the consumer's account when the consumer initiates an electronic fund transfer. (Regulation E § 205.7(b)(11), Appendix A-2(j).) The mandatory use of the word "may" is important because the notice is designed to sensitize the consumer to the possibility of a fee, but no more. The card issuing institution does not have the information necessary at the moment of this initial disclosure to provide a more definitive disclosure.

    <u>Signage Disclosure by ATM Operator</u>—The ATM operator is required to post at each ATM a sign that alerts any consumer approaching a machine of the fee policy at that particular ATM. The disclosure duty does not require that the amount of any fee be disclosed on the sign. Until the consumer identifies himself by inserting his card, the amount of any fee applicable to any particular consumer would indeed be unknowable. Congress, in the statutory language (EFTA § 904(d)(3)(B)(i)), and the Board, in its regulatory requirement (Regulation E § 205.16(c)(1)), clearly recognized the impracticality of requiring disclosure of the amount on the sign.

    While not required to disclosure an amount on the sign, the ATM operator is required to disclose "the fact that a fee is to be imposed." (EFTA §§ 904(d)(3)(A)(i); 904(d)(3)(B)(i).) That fact, like the amount of the fee, cannot be determined in most situations until the particular consumer has been identified.

---

[3] "The Board's [prior] proposal acknowledged that a strict requirement to post a notice that a fee will be imposed in all instances could result in an inaccurate disclosure of the ATM operators' surcharge practices and is not mandated by the current language of 205.16." 70 F.R. 49891, Section III, paragraph 3 (August 25, 2005)

5

<u>On-Screen Disclosure by ATM Operator</u>—ATM operators provide an on-screen notice to consumers for whom they are not the account holder (i) that a fee will be imposed and (ii) the amount of the fee. (Regulation E §§ 205.16(b); 205.16(c)(2); 205.9(a)(1).) Once the consumer identifies himself, a notice containing the precise dollar amount of any fee will be provided within seconds and will have taken into account a number of pieces of information (e.g., card issuing bank identity, nature of the transaction, special account status). The notice on the screen will use the explicit language of Regulation E in all circumstances and notify the consumer that, e.g., "A fee of $1.00 will be charged for this transaction." The transaction will be completed and the fee applied only if the consumer takes a positive step to complete the transaction in response to clear, on-screen prompts, such as (i) "to continue the transaction and accept this charge, complete step X" or (ii) "do you wish to continue?" If the consumer cancels the transaction, or does nothing more, no transaction will occur and no fee will be charged.

<u>Receipt Disclosure by ATM Operator</u>—If the consumer completes the transaction, the ATM operator will provide a receipt to the consumer that again will set forth the amount of any transaction fee. (Regulation E § 205.9(a)(1).)

In addition to the requirements for disclosures by certain ATM operators and for the notice by the account holding institution that other ATM operators may impose a fee for electronic fund transfers, an account holding institution that is also an ATM operator must disclose, at account opening and on periodic statements, the ATM fees that it charges to its own customers. (Regulation E §205.7(b)(5), §205.9(b)(3)). There is no shortage of information about transaction fees, in other words, and certainly no basis for requiring an unequivocal and potentially chilling statement that a fee "will" be imposed that is false at least as often as it is true.

**4. Responses to the Board's explicit solicitation for information**

A. <u>What are the current ATM disclosure practices of ATM operators that impose fees on some, but not all, consumers?</u>

While we have not attempted to research all of the historical or present ATM fee disclosure requirements of each card system operating in the U.S., we note the pattern exhibited in the above-described major Network's rules was, and is, common among some of the largest systems in the U.S. For example, Honor (another of the largest multi-state systems which serviced the South and Southwest, and is now merged into Star System), NYCE (a system that services primarily the Northeastern states) and Cirrus (a national system) are all ATM systems that have rules requiring ATM signage containing comparable disclosure patterns; that is, a sign that alerted consumers, in instances where charges were not universally applied, that a charge "may" be applied, followed by a precise on-screen disclosure.

From this industry experience there is evidence that a sign stating that a fee "may" be imposed followed by an explicit on-screen disclosure is the most effective way of informing consumers of the possible fee. One of the nation's leading ATM networks, whose members provide signage disclosure that states that they "may impose a fee," published surveys in 2003 and 2004 that found that 92% of consumers surveyed felt

6

they had been adequately informed of any fees at the ATM terminal. These survey results confirm that the current two-step disclosure pattern was not only sound in theory but also effective in practice. The surveyed consumers themselves feel well informed about ATM fees.

B. <u>Under what types of circumstances might an ATM operator not impose a surcharge?</u>

The Board's proposal reflects appropriate policies in light of the myriad arrangements ATM operators have with consumers using ATMs. For example, ATM operators may choose not to impose surcharges on the following categories of cardholders:

1. Cardholders whose cards are issued by the ATM operator.

2. Cardholders of foreign banks.

3. Cardholders of banks that are corporate affiliates of the ATM operator.

4. Persons who carry cards that are issued under government electronic benefit transfer programs.

5. Cardholders whose non-affiliated card issuer has entered into a special contractual relationship with the ATM operator regarding surcharges.

6. Cardholders in special circumstances, such as the aftermath of natural disasters or other events which compromise access to banking services.

Because few, if any, ATM operators either charge all cardholders a surcharge or charge no cardholders a surcharge, the binary alternatives arguably imposed by the Regulation E language would result in an inaccurate disclosure if an ATM operator could not rely on the clarification in the Board's proposal.

Although statistics can vary widely due to pricing policies and market-share in a locality, some actual examples are telling. One large national ATM operator that imposes surcharges estimates that only 11% of its ATM cash withdrawals actually result in a surcharge. Consequently, a "will charge" sign with no qualifying language would provide completely wrong information to nearly 90% of consumers who approach its machines. Another large regional ATM operator reports that 2/3 of all cash withdrawals at its ATMs result in a fee waiver; thus only 1/3 of its ATM users pay a fee. Hence, a sign posted on an ATM that informs all consumers that a fee "will" be imposed is not just marginally inaccurate in thousands of instances, it is a dramatic misrepresentation to most consumers who approach those ATMs.

The high percentages of transactions for which fees are waived reflect, in both instances, policies of these two banks under which fees are not imposed on consumers who have cards issued by those banks. Hence, fee waivers for such on-us transactions are included in those statistics. No signage disclosure regarding fees to accountholders of the ATM operator is mandated by Section 205.16 (but an on-screen disclosure is mandated by 205.9(a)(1)). So where customers have an account with the ATM operator,

the "will impose a fee" disclosure language would be wholly inaccurate and potentially confusing to them. The disclosure would appear to contradict one of the features of the customer's account that is likely to have been influential in the customer's choice of that bank in the first place – a no-fee ATM card. The mischief of the "will impose" disclosure is therefore compounded from mere misinformation to an undermining of the customer-bank relationship.

There are ample reasons for fee waivers apart from a waiver for a bank's own customers. One of the banks referred to above reports that waivers result in non-fee transactions for *non-customers* that range from 6% to 26% depending on geographic location. The second ATM operator referred to above estimates fee waivers for its *non-customer* users system-wide at about 16% over a recent 2.5 year period. Yet a third major bank, with ATMs placed nationwide, reports that 7.3% of its non-customers are not charged a cash withdrawal fee. These cash withdrawals, which are not on-us transactions but for which no ATM fees are imposed, constitute millions of transactions annually for just these three banks.

Further, the analysis above focuses only on signage disclosure regarding fees for cash withdrawals. But the EFTA and Regulation E, Section 205.16, also require signage disclosure of fees levied for balance inquiries. ATM operators may make similarly complex price differentiations for customers who avail themselves of a balance inquiry service. This could require similarly complex and lengthy signage disclosures if the ATM operator were mandated to state that it "will" impose fees and had to augment the signage with a statement of exceptions.

C    <u>If surcharges are not imposed on all consumers, how do ATM operators disclose their surcharge practices?</u>

As more fully described in the answer to question A above, many ATM operators offer an ATM sign stating that a fee "may" be imposed followed by a more detailed disclosure on screen of the fact and amount of the charge enabling the consumer to halt the transaction before committing to pay the fee.

D.    <u>What adverse impact on consumers, if any, might result from a disclosure that states that an ATM surcharge will be imposed when an operator's practice is not to impose a surcharge on certain customers?</u>

Because ATM surcharges are rarely universally imposed on all consumers, ATM operators cannot say that they "will" impose a fee without misinforming many, if not most, consumers. ATM operators will notify their own account holders separately about their fee policies through required disclosures under Regulations E and DD, or otherwise. Even account holders who have received such notice, however, may be confused when confronted with ATM signs that misstate that a fee will be imposed when in fact a fee will not be imposed.

Alternatives to the Board's proposal, which conceivably might avoid misleading disclosures, are basically unworkable. For instance, ATM operators might be required to add qualifying language to the small ATM sign, in concept stating, "but no fee will be charged to . . . (then listing all categories of fee exceptions)." Assuming that such additional language would be permitted by Regulation E, it is a highly undesirable route to pursue.

First, in the best of circumstances, it would produce a sign that would not be consumer friendly. A sign posted by Bank A, as an ATM operator, might read: "Bank A will charge a fee for withdrawing cash. This fee will not apply to customers using (i) a Bank A card [or the sign will specify some subset of such customers], (ii) a card issued by [list of corporate affiliate banks], (iii) a card issued by [list of banks with which Bank A has an agreement not to impose fees, which may vary by region], (iv), a card issued by a bank not incorporated in the United States, (v) a card issued under [list of governmental benefits programs for which fees are waived], or (vi) a card issued by [list of employers with which Bank A has a payroll card or similar arrangement] or (viii) if your account is a [list of special status accounts recognized by Bank A]."

Such an ATM sign, riddled with detailed exceptions, would be of little practical value to consumers. It would be understandable only with detailed study. It would not set forth the amount of the fee, which may vary depending on the customer's status. It would certainly be of no additional value to the short, simple, direct individualized and precise on-screen disclosure that the consumer receives when the consumer inserts his card in the card-reader. Further, a sign that lists some, but not all, of the fee exceptions may be even more confusing.

Finally, such a signage policy of detailed disclosure would be extraordinarily costly to implement. Legions of ATM operator employees would need to be dispatched nationwide to remove old signage and install new signage. Even worse, ATM operators would need to repeat the process continually, each and every time a business decision resulted in a change to the fee policy. Because the electronic banking business is evolving so rapidly and is so highly competitive, pricing changes may occur frequently. Signage would need to be replaced on tens of thousands of ATMs every time, for instance, a new fee waiver agreement was reached with another bank.

The expense of repeated signage replacements would be staggering. One CBA member bank with approximately 6,000 ATMs estimates that a single change of signage would cost it $200,000 and would take three months to execute. Additionally, the time necessary for physically accomplishing the signage changes would render at least some of the signs inaccurate at any given time. Hence the end result of such Herculean efforts would be signage that would still be inaccurate as to some percentage of users. Such a scenario is not likely a result that either Congress or the Board intended to impose.

The entire purpose of pre-transaction disclosures is to inform consumers about the consequences of behavior they are contemplating, and that information, in turn, is expected to influence consumer behavior. If an ATM sign must state that a fee "will" be charged, we must assume that consumers wishing to avoid charges will abandon that machine and seek a machine without such a sign. But for most consumers encountering such a sign the information would simply be false, because for most consumers there would be no fee or the fee would be waived. More ironically, if the consumer reacts to the "will be imposed" signage at one ATM, the consumer may seek out another ATM, only to find that it too – and the next one, and the one after that – all bear the same "fee will be imposed" signage, even though in fact the consumer's transaction would have been free at some or all of those machines. In other words, a universal "will be imposed" signage rule results in a disclosure that is not only inaccurate, but also absolutely useless to differentiate one ATM from another.

As we recently witnessed in the Gulf Coast region, a natural disaster may displace tens of thousands of people who critically need ready access to cash. Bank regulatory agencies responded to Hurricane Katrina by requesting that ATM operators waive ATM fees[4] in order to better serve a population with little or no choice of which ATM to use to access desperately needed funds. This sort of waiver may not be uncommon in natural disaster situations such as earthquakes, tornadoes and hurricanes. In such instances, where time and every dollar counts, consumers should not be misled by signage that says a fee "will" be charged when fees may have been waived for certain populations.

In each of these instances, the Board's proposal will alert a potential user, through signage, that a fee "may" be imposed. If the consumer chooses to proceed, within seconds after the consumer has identified himself via the ATM card reader, the consumer will be presented with a simple, explicit price that is accurate at that moment, under the particular circumstances that relate to that identified consumer.

E.   What would be the adverse impact, if any, on consumer reading ATM signage stating that a fee "may" be charged?

---

[4] A joint press release encouraging ATM fee waivers was promulgated on September 1, 2005 by the Federal Reserve System, the FDIC, the OCC and the other federal financial institution regulatory agencies, and the Conference of State Bank Supervisors. The release can be found at http://www.federalreserve.gov/boarddocs/press/bcreg/2005/20050901/default.htm.

Consider the reality of an ATM operator wishing to act on such a public policy request. Software programming can be changed relatively inexpensively and rapidly to implement such an emergency waiver. If the signage states that a fee "may be imposed," the signage disclosure would be accurate without amendment. The cardholder would be informed on the screen that no fee would be imposed. Conversely, if the ATM operator used signage that indicated that a fee "will be imposed," there would be no practical way to amend the signage to signal the hurricane victims that such a statement did not apply to them.

In addition, the U.S. Treasury Department issued a similar request regarding ATM fee waivers for FEMA-issued "Cash cards," which notice can be found at http://www.fms.treas.gov/surcharge_waiver.html.

10

The Consumer Bankers Association sees no adverse impact on any consumer resulting from reading a sign that says a fee "may" be imposed. The word "may" only means a fee is possible, and each consumer will receive an on-screen disclosure regarding whether a fee will be charged and be given the opportunity to cancel the transaction without incurring any fee.

F. <u>What was the practice of ATM operators at time GLBA was passed?</u>

The Board has asked about the ATM fee disclosure patterns prior to the passage of the GLBA Act. As noted above in Section 3, many major ATM systems had implemented a disclosure pattern of signage that stated that the ATM operator "may charge a fee" followed by an explicit on-screen disclosure.

G. <u>Conclusion</u>

CBA supports the proposal as written. We believe it is a sound and reasonable solution to an existing ambiguity in the regulation, which would otherwise call for a disclosure in all cases that would be misleading in many—if not most—situations. As noted above, too literal an application of the Regulation E requirement would result in an inaccurate disclosure; a disclosure that a fee will be imposed on customers on whom no fee will, in fact, be imposed. We believe that disclosures should be accurate, and that providing accurate disclosures ought not to raise questions of technical regulatory compliance.

CBA endorses the Board's proposal as a logical, effective and simple way to clarify existing requirements and ensure that ATM operators provide accurate disclosures to consumers.

We are pleased to have had the opportunity to comment on the Board's proposal. Please contact either of us if you have any questions or need further information.

**Sincerely,**

Steve Zeisel                              Ralph J. Rohner
Vice President and Senior Counsel         Special Counsel