# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

_____
                                        )
RAYMOND MORRISSEY,                      )
                                        )
            *Plaintiff,*                 )
                                        )
    v.                                  )        Civil Action No. 05-10984-WGY
                                        )
WEBSTER BANK, N.A.,                     )
                                        )
            *Defendant.*                 )
_____)

## DEFENDANT WEBSTER BANK, N.A.'S SUPPLEMENTAL
## MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant Webster Bank, N.A. ("Webster") hereby submits this supplemental memorandum solely to bring to the Court's attention a recently adopted federal regulation that bears directly on this dispute and that will materially assist the Court in rendering its decision on Webster's motion for summary judgment (the "Motion").

On October 31, 2005, defendant Webster filed the Motion. In support of the Motion Webster argued, among other things, that the Complaint should be dismissed as a matter of law because the Federal Reserve Board ("Board") had proposed a revision to Regulation E, 12 C.F.R. § 205.16, that authorized ATM fee notices, such as those posted by Webster, to state that a fee "may" be imposed. On November 21, 2005, plaintiff Raymond Morrisey filed an opposition to the Motion. On November 30, 2005, the Court scheduled a hearing on the Motion for January 10, 2006. On December 7, 2005, Webster filed a reply memorandum in further support of the Motion.

On December 30, 2005, the Board announced that it had adopted final amendments to Regulation E that are consistent with the proposed revisions regarding ATM fee notices. Specifically, the final rule expressly authorizes ATM operators to post fee notices stating that a

fee "may" be imposed where "there are circumstances," such as those present here, "under which a fee will not be imposed for such services." <u>See</u> 12 C.F.R. § 205.16 (2005) (a copy is attached as Exhibit A).[1]  In light of this amendment, Webster's fee notices are unquestionably permissible under Regulation E.  Moreover, the Board's commentary on the final rule makes clear that Webster's fee notices were also authorized by the regulation as originally promulgated.  As the commentary states, "while the Board is amending the regulation to address this issue, <u>this amendment does not represent a change in the Board's interpretation of the rule's requirement</u>." <u>Id.</u> at p. 39 (emphasis added).

In light of the Board's final adopted amendments to Regulation E, and for the reasons stated in Webster's memorandum of law and reply memorandum of law in support of its Motion, Webster respectfully requests that this Court grant Webster's Motion.

Respectfully submitted,

WEBSTER BANK, N.A.,

By its attorneys,

 /s/ Jonathan I. Handler
Jonathan I. Handler (BBO # 561475)
Hobart F. Popick (BBO # 658763)
DAY, BERRY & HOWARD LLP
One International Place
Boston, Massachusetts 02110
(617) 345-4600

-and-

Steven M. Greenspan (admitted *pro hac vice*)
DAY, BERRY & HOWARD LLP
CityPlace I
Hartford, Connecticut 06103
(860) 275-0100

Dated:  January 5, 2006

---

[1]    A copy of the final rule is also available at <u>http://www.federalreserve.gov/BoardDocs/Press/bcreg/2005/20051230/attachment.pdf</u>.

## <u>CERTIFICATE OF SERVICE</u>

I, Jonathan I. Handler, hereby certify that on the 5th day of January, 2006, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to:  Christopher M. Lefebvre, Esq., Claude Lefebvre, P.C., Two Dexter Street, Pawtucket, Rhode Island 02860.

 /s/ Jonathan I. Handler
Jonathan I. Handler

**FEDERAL RESERVE SYSTEM**

**12 CFR Part 205**

**[Regulation E; Docket Nos. R-1210 and R-1234]**

**Electronic Fund Transfers**

**AGENCY:**  Board of Governors of the Federal Reserve System.

**ACTION:**  Final rule; official staff interpretation.
_____

**SUMMARY:**  The Board is amending Regulation E, which implements the Electronic Fund Transfer Act, and the official staff commentary to the regulation.  The commentary interprets the requirements of Regulation E to facilitate compliance primarily by financial institutions that offer electronic fund transfer services to consumers.

　　　The revisions address the regulation's coverage of electronic check conversion services. Under the final rule, merchants and other payees that initiate electronic check conversion transactions must obtain a consumer's authorization for each transaction.  In addition, commentary revisions address preauthorized transfers, error resolution, and other matters.

**DATES**:  The final rule is effective **[Insert date 30 days from the date of publication in the Federal Register.]**  The mandatory compliance date is January 1, 2007.

**FOR FURTHER INFORMATION CONTACT:**  Ky Tran-Trong, Senior Attorney, or Daniel G. Lonergan, David A. Stein or John C. Wood, Counsels, Division of Consumer and Community Affairs, Board of Governors of the Federal Reserve System, Washington, D.C. 20551, at (202) 452-2412 or (202) 452-3667.  For users of Telecommunications Device for the Deaf (TDD) only, contact (202) 263-4869.

**SUPPLEMENTARY INFORMATION:**

**I.  Statutory Background**

　　　The Electronic Fund Transfer Act (EFTA or Act) (15 U.S.C. 1693 <u>et</u> <u>seq</u>.), enacted in 1978, provides a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund transfer (EFT) systems.  The EFTA is implemented by the Board's Regulation E (12 CFR part 205).  Examples of types of transfers covered by the Act and regulation include transfers initiated through an automated teller machine (ATM), point-of-sale (POS) terminal, automated clearinghouse (ACH), telephone bill-payment plan, or remote banking service.  The Act and regulation require disclosure of terms and conditions of an EFT service; documentation of EFTs by means of terminal receipts and periodic account activity statements; limitations on consumer liability for unauthorized transfers; procedures for error

resolution; and certain rights related to preauthorized EFTs. Further, the Act and regulation also prescribe restrictions on the unsolicited issuance of ATM cards and other access devices.

The official staff commentary (12 CFR part 205 (Supp. I)) is designed to facilitate compliance and provide protection from liability under Sections 915 and 916 of the EFTA for financial institutions and persons subject to the Act. 15 U.S.C. 1693m(d)(1). The commentary is updated periodically to address significant questions that arise.

## II. Background and Overview of Comments Received

On September 17, 2004, the Board published a notice of proposed rulemaking in the Federal Register (69 FR 55,996) (September 2004 proposal) to provide guidance regarding the rights, liabilities, and responsibilities of parties engaged in electronic check conversion (ECK) transactions and to provide rules governing the coverage under Regulation E of payroll card accounts. In addition, proposed commentary revisions provided guidance on preauthorized electronic transfers from a consumer's account, error resolution procedures, ATM disclosures, and other matters.

The Board received nearly 120 comment letters on the September 2004 proposal. Comments were received from a variety of industry commenters, including banks, thrifts, credit unions, payment card companies, payment processing companies, and industry trade associations. Comments were also received from consumer groups, the Department of the Treasury, the Federal Trade Commission and individual consumers. The following is a summary of significant proposed revisions to the regulation and the staff commentary, and the comments received.

Electronic Check Conversion

The EFTA expressly provides that transactions originated by check, draft, or similar paper instrument are not governed by the Act. In an ECK transaction, a consumer provides a check to a payee and information from the check is used to initiate a one-time EFT from the consumer's account. Specifically, the payee electronically scans and captures the MICR-encoding on the check for the routing, account, and serial numbers, and enters the amount to be debited from the consumer's asset account.

Under the staff commentary, electronic check conversion transactions are covered by the EFTA and Regulation E if the consumer authorizes the transaction as an EFT. Under existing commentary provisions, a consumer authorizes an EFT if the consumer receives notice that the transaction will be processed as an EFT and the consumer completes the transaction. See comment 3(b)-3. This standard applies whether the check conversion occurs at a point-of-sale (where a person goes to a merchant's physical location to obtain goods or services) or in an accounts receivable conversion (ARC) transaction where the consumer mails a fully completed and signed check to the payee that is converted to an EFT. Although merchants and other payees are in the best position to provide notice to a consumer for the purpose of obtaining the consumer's authorization for an ECK transaction, they are not currently covered by the commentary provision in Regulation E addressing ECK transactions.

Over the past few years, several issues have arisen relating to ECK transactions in general, and ARC transactions in particular. Concerns have been raised about the uniformity and adequacy of some of the notices provided to consumers about ECK transactions. Some in the industry would like the flexibility to obtain a consumer's authorization to process a transaction either as an EFT or as a check. Board staff also has received inquiries from financial institutions and other industry participants concerning their obligations under Regulation E in connection with ECK services.

The Board proposed to revise the regulation to require merchants and other payees that use information from a check to initiate a one-time EFT from a consumer's account to provide notice to the consumer and obtain the consumer's authorization for each EFT. The Board specifically solicited comment on whether payees should be required to obtain a consumer's written, signed authorization when the transaction occurs at POS. To help consumers understand the nature of an ECK transaction, the Board also proposed to require payees in ECK transactions to disclose to consumers that when a check is converted, funds may be withdrawn from their accounts quickly, and that the check will not be returned by the consumer's financial institution.

Industry commenters supported many of the proposed revisions addressing ECK transactions, including coverage under Regulation E of merchants and other payees for the limited purpose of providing notice to obtain consumer authorization for ECK transactions. Some industry commenters, however, raised concerns about requiring the authorization to be written and signed for POS transactions. They also raised concerns about providing consumers with disclosures explaining that funds may be withdrawn from the account quickly and that checks will not be returned to the consumer. Commenters asserted, for example, that a written, signed authorization requirement could stifle industry innovation, and that the additional information about ECK transactions would result in overly lengthy disclosures.

Consumer groups also supported many of the proposed revisions addressing ECK transactions, including merchant coverage and the additional disclosure requirements. Consumer groups stated, however, that the Board should require a consumer's written, signed authorization for other debits that may occur in connection with the underlying ECK transaction, such as for debits to collect service fees when consumers have insufficient funds in their account to cover the underlying transaction, since consumers are unlikely to expect the additional debits to their accounts.

Error Resolution

Section 205.11(c)(4) provides that a financial institution may satisfy its obligation to investigate an alleged error by reviewing its own records if the alleged error concerns a transfer to or from a third party and there is no agreement between the institution and the third party for the type of EFT involved. This rule is commonly referred to as the "four walls" rule. The Board proposed to revise the staff commentary to clarify that an institution would not satisfy its error resolution obligations solely by reviewing the payment instructions if, for example, there is additional information within the institution's own records that would assist in resolving the alleged error.

Many industry commenters opposed the Board's proposed commentary revisions, expressing concern about the potential scope of information that might need to be reviewed under the proposed revisions to the four walls standard. Consumer groups favored the proposed comment, and urged the Board to revise the comment to state that an institution's review should consider records that could be helpful to resolving the consumer's claim, not just those records that were dispositive.

Preauthorized Transfers

Section 205.10(b) requires that recurring electronic debits from a consumer's account be authorized "only by a writing signed or similarly authenticated by the consumer." Existing commentary provides that a tape recording of a telephone conversation with a consumer who agrees to preauthorized debits does not constitute written authorization under § 205.10(b). The Board proposed to withdraw the existing commentary to address industry concerns that the guidance may conflict with the Electronic Signatures in Global and National Commerce Act (E-Sign Act), 15 U.S.C. 7001 et seq. Many industry commenters, in particular those representing retailers, supported the proposed withdrawal, with some of these commenters asking the Board to explicitly state that a recorded conversation complies with the E-Sign Act. Other commenters, however, opposed the withdrawal of the guidance due to concern about potential abuses and the possible increase in unauthorized transfers that could result. Consumer groups did not comment on the proposed withdrawal.

ATM Disclosures

Section 205.16 provides that an ATM operator that imposes a fee ("surcharge") on a consumer for initiating an EFT or balance inquiry must post a sign at ATMs that a fee will be imposed for providing EFT services or for balance inquiries. The September 2004 proposal included proposed commentary revisions to provide ATM operators flexibility when disclosing these surcharges. In particular, the proposal clarified that ATM operators could disclose on ATM signage that a surcharge "may" be imposed if there are circumstances where the operator would not impose such a fee for use of its ATM. (Before a surcharge may be imposed by an ATM operator, the operator must provide a separate on-screen notice or a receipt informing the consumer that a fee will be charged and the amount of the fee, and the consumer must elect to continue the transaction.) In August 2005, the Board withdrew the proposed commentary revisions and issued a new proposal to incorporate this clarification into both the regulation and the commentary. See 70 FR 49,891 (Aug. 25, 2005) (August 2005 proposal). The Board received approximately 25 comments on the August 2005 proposal from a variety of industry commenters, including banks, credit unions and trade associations. Industry commenters strongly supported the revised proposal stating that it would provide institutions with flexibility to provide more accurate disclosures and reduce consumer confusion. Consumer groups and one consumer rights advocate, however, asserted that the revised proposal would not ensure that consumers who are charged a fee will receive adequate notice on ATM signage.

Payroll cards

The September 2004 proposal also included rules governing the coverage under Regulation E of payroll card accounts that are established either directly or indirectly by an employer on behalf of a consumer for the purpose of providing salary, wages, or other employee compensation on a recurring basis. An interim final rule is being published separately in this Federal Register to address payroll card accounts.

## III. Overview of the Final Rule

The Board is adopting final revisions to Regulation E and the staff commentary largely as proposed. However, several clarifications and modifications to the proposal have been made to respond to commenters' concerns. The following is a summary of significant revisions to the regulation and the staff commentary. All of the revisions are discussed in detail below in the section-by-section analysis. The rule is effective **[Insert date 30 days from the date of publication in the Federal Register.]** The mandatory compliance date for the final rule is January 1, 2007.

Electronic Check Conversion

Merchant coverage  The final rule provides that merchants and other payees that use information from a check to initiate a one-time EFT from a consumer's account are subject to the regulation solely for the limited purpose of obtaining a consumer's authorization for the one-time transfer. Generally, authorization is obtained when the payee provides a notice to the consumer that a check received as payment will be converted to an EFT, and the consumer goes forward with the transaction. At POS, the notice must be posted in a prominent and conspicuous location, and a copy of the notice must be provided to the consumer at the time of the transaction, such as on a receipt. For ARC transactions, the notice will typically be provided on a billing statement or invoice. Model clauses are provided to try to minimize the risk that merchants and other payees will be subject to private actions.

Alternative authorization  As proposed, the final rule recognizes that payees may obtain a consumer's authorization to use information from the consumer's check to initiate an EFT, or, alternatively, to process the transaction as a check.

Additional disclosures about ECK transactions  To help consumers understand the nature of ECK transactions, the final rule provides that persons initiating an ECK transaction, whether at POS or in an ARC transaction, must disclose to the consumer that when a check provided as payment is used to initiate an EFT, funds may be withdrawn from the consumer's account as soon as the same day payment is made (for POS transactions) or received (for ARC transactions). Payees must also disclose, as applicable, that the consumer's check will not be returned by the consumer's financial institution. Under the final rule, for POS transactions, payees may provide these additional disclosures on a sign. The requirement to provide these disclosures sunsets three years from the mandatory compliance date of this final rule.

Collection of Service Fees via EFT

The final rule, as proposed, provides that payees that choose to collect a service fee via an EFT due to insufficient or uncollected funds in a consumer's account in connection with the underlying transaction must obtain the consumer's authorization to collect the fee. Authorization is obtained when a payee provides notice to the consumer stating that the fee will be collected via an EFT and the consumer goes forward with the transaction. Payees also are required to disclose the amount of the fee on the notice.

Error Resolution

The final rule provides that a financial institution does not satisfy its error resolution responsibilities under the "four walls" rule by solely reviewing the payment instructions; an institution must review any additional information within the institution's own records pertaining to the particular account in question that would assist in resolving the alleged error.

Preauthorized Transactions

The final rule, as proposed, withdraws the existing commentary stating that a tape recording of a telephone conversation with a consumer who agrees to preauthorized debits does not constitute written authorization under the regulation.

Disclosures at Automated Teller Machines

The final rule, as proposed in the August 2005 proposal, revises the regulation to permit ATM operators to alternatively provide notice on ATM signage that a surcharge <u>may</u> be imposed (in place of a disclosure that a surcharge <u>will</u> be imposed) if there are circumstances in which an ATM fee may not be charged.

Effective Date of Rule

The effective date of the final rule is **[Insert date 30 days from the date of publication in the Federal Register]**. While institutions may, if they choose, begin complying with the new requirements on **[Insert date 30 days from the date of publication in the Federal Register]**, compliance with this final rule is not mandatory until January 1, 2007. The additional time should give persons affected by this final rule adequate time to implement the new requirements, including developing the new required notices for ECK transactions.

## IV.  Section-by-Section Analysis

## Section 205.3 Coverage

## 3(a) General

Section 205.3(a) is revised to provide that § 205.3(b)(2), discussed below, applies to any person.

## 3(b) Electronic Fund Transfer

The term "electronic fund transfer" is defined in § 205.3(b)(1) as "any transfer of funds that is initiated through an electronic terminal, telephone, computer, or magnetic tape for the purpose of ordering, instructing, or authorizing a financial institution to debit or credit an account." The term includes POS transfers, ATM transfers, direct deposits or withdrawals of funds, telephone transfers and debit card transactions. The final rule includes language in the existing regulation that was inadvertently omitted in the September 2004 proposal. Comments 3(b)-1 and 3(b)-2 are redesignated as comments 3(b)(1)-1 and 3(b)(1)-2, and conforming changes are made to comments 2(a)-2 and 3(c)(1)-2.

Electronic Check Conversion

The EFTA excludes from the definition of "electronic fund transfer" any transaction "originated by check, draft, or similar paper instrument." 15 U.S.C. 1693a; see also § 205.3(c)(1). In ECK transactions, a consumer provides a check to a merchant or other payee to use as a source of information to initiate an EFT from the consumer's account as payment for the purchase of goods or services, and not to initiate a payment by check. The payee electronically captures the routing, account, and serial numbers from the check and initiates a one-time EFT from the consumer's account. The Board proposed to amend § 205.3(b)(2) of Regulation E and comment 3(b)(2)-1 to clarify that ECK transactions are covered by Regulation E and deemed not to originate by check. Substantially similar guidance previously had been provided in the commentary to Regulation E. The few commenters addressing the issue agreed that the guidance regarding the status of ECK transactions under Regulation E is more appropriately placed in the regulation. Accordingly, the proposal has been adopted in § 205.3(b)(2)(i) with minor revisions. Section 205.3(b)(2)(i) further provides that a consumer must authorize an ECK transaction (discussed below).

One industry commenter expressed concern that the proposed regulatory language was too broad in stating that a transaction is covered by Regulation E where a check is "used as a source of information to initiate a one-time EFT." According to the commenter, some may interpret the language to include transactions arising from electronic check presentment or image exchange. The Board agrees; § 205.3(b)(2)(i) is intended to apply only when a payee uses a check as a source of information to initiate an EFT from the consumer's account. New comment 3(b)(1)-2. iv clarifies that transactions arising from the electronic collection, presentment, or return of checks through the check collection system, such as through the transmission of electronic check images, are not EFTs covered by Regulation E.

A few commenters asked the Board to clarify that the rules applying to ECK transactions were not intended to apply to Internet- or telephone-initiated transactions (where a consumer provides information—including the MICR-encoding—from his or her check to pay for a purchase via these payment channels). While Internet- and telephone-initiated transactions are covered by Regulation E because they result in electronic transfers from the consumer's account, the rules for ECK transactions do not apply to these transactions.

Coverage of merchants and other payees

Currently, a merchant or other payee that engages in ECK transactions is not covered by Regulation E because it does not meet the definition of "financial institution."  Under § 205.2(i) the term "financial institution" means a "bank, savings association, credit union, or any other person that directly or indirectly holds an account belonging to a consumer, or that issues an access device and agrees with a consumer to provide electronic fund transfer services."  The Board has previously acknowledged that a merchant or other payee is in the best position to provide notice to a consumer for the purpose of obtaining authorization of an ECK transaction. See 66 FR 15,187, 15,189-90 (March 16, 2001).  The Board has not covered merchants and other payees previously under the regulation because it expected that these persons would provide consumers with the necessary notice.  In response to concerns about the uniformity and adequacy of some of the notices provided to consumers about ECK transactions, the Board proposed to exercise its authority under Sections 904(c) and 904(d)(1) of the EFTA to require merchants and other payees that initiate a one-time EFT using information from the consumer's check, draft or similar paper instrument, to provide notice to obtain a consumer's authorization for the transfer. The final rule is adopted, as proposed.  Coverage of merchants and other payees under the final rule is solely for the limited purpose of obtaining consumer authorizations for ECK transactions. A financial institution will be subject to the requirement to obtain consumer authorization for the transaction to the extent that the institution initiates an EFT using information from a consumer's check (e.g., if the institution converts checks provided as a payment for a mortgage loan).

Most commenters supported the proposed revision in § 205.3(b)(2)(ii) because they believe the merchant is in the best position to provide the notice.  According to one commenter, the consumer's financial institution has no control over a consumer receiving proper notice for purposes of authorization.  A few commenters noted the importance of covering merchants and other payees for enforcement purposes.  Several commenters also noted that requiring merchants and other payees to adhere to minimum authorization and related notice provisions will better inform consumers on a consistent basis about ECK transactions.  Moreover, according to these commenters, the authorization requirement would not pose new or significant compliance burdens since payment system rules currently impose an authorization requirement on merchants and other payees.  While supporting the proposed requirement, a few commenters requested clarification that merchants and other payees would be covered solely for the limited purpose of the authorization requirement for ECK transactions.

Some industry commenters opposed the proposed requirement.  A few commenters believed merchants and other payees should not be required to assume the liability risks that may be associated with ECK transactions.  A few commenters requested clarification of the FTC's enforcement authority for merchants and other payees not regulated by federal banking agencies. A few commenters believed the requirement is an unnecessary duplication of payment system rules.

The Board believes coverage of merchants and other payees in § 205.3(b)(2)(ii) for the limited purpose of providing a notice to obtain consumer authorization for ECK transactions is appropriate to ensure consumers understand that checks will be processed as EFTs.  Without such a notice requirement, different information may be given by merchants to consumers, or information may be given solely by signage or other forms that may not be easily discernable by consumers.  In addition, coverage of merchants and other payees for the limited purpose of

obtaining consumer authorization for ECK transactions will provide a mechanism to ensure that consumers, in fact, receive appropriate notice of check conversion. For those entities subject to FTC enforcement, the FTC would have enforcement authority pursuant to Section 917(c) of the EFTA and under the Federal Trade Commission Act. Merchant coverage would also enable the Board to provide model clauses that will aid consumer understanding of ECK transactions. The model clauses provide a safe harbor from liability, thereby reducing liability risks. <u>See</u> § 205.3(b)(2)(iv).

<u>General authorization requirements</u>

As previously noted, revised § 205.3(b)(2)(i) provides that a consumer must authorize an ECK transaction. The current commentary states that a consumer authorizes an ECK transaction when the consumer receives notice that the transaction will be processed as an EFT and completes the transaction. <u>See</u> comment 3(b)-3. This guidance, originally proposed to be placed in comment 3(b)(2)-1, is moved to § 205.3(b)(2)(ii) of the final rule. The phrase "completes the transaction" is replaced with "goes forward with the transaction" to clarify that it is not necessary for a transaction to clear or settle in order for authorization to occur. In addition, under the final rule, for POS transactions, a notice must be posted in a prominent and conspicuous location, and a copy of the notice must be provided to the consumer at the time of the transaction, such as on a receipt.

In the proposal, the Board stated that at POS, a written, signed authorization may be a more effective means than posted signage for informing consumers that their checks are being converted. The Board did not propose to require merchants or other payees to obtain the consumer's signed authorization to convert checks received at POS, but specifically solicited comment on whether this should be required. The final rule does not require a merchant or other payee to obtain the consumer's signed authorization for an ECK transaction.

Some commenters supported a signed authorization requirement for POS transactions. Several of these commenters stated the requirement would be beneficial for enforcement purposes to ensure that consumer authorization is, in fact, obtained by a payee. A few commenters stated that the Regulation E rule should be consistent with the rules established by NACHA – the Electronic Payments Association (NACHA rule(s))—which requires a consumer's written, signed authorization. One such commenter stated making the rules consistent would address consumer confusion issues. Another commenter stated that the current difference between the NACHA rule and Regulation E creates the potential for monetary penalties imposed by NACHA if the payee follows the Regulation E notice rule and does not also comply with NACHA's signed authorization rule. A few commenters noted that there would be no additional regulatory burden associated with a signed authorization requirement since it is already required by NACHA. Some commenters expressed the view that a signed authorization requirement calls a consumer's attention to, and reinforces an awareness of, check conversion.

The majority of commenters opposed a signed authorization requirement for POS transactions under Regulation E. Specifically, some of these commenters stated that the NACHA rule is sufficient, and that a payments system rules-driven approach is preferable to

regulation. Several commenters expressed concern that such a requirement would unnecessarily delay transactions at POS. According to one commenter, a signed authorization requirement could impede the general movement toward facilitating paperless payments. A few commenters stated the requirement may limit the industry's flexibility to deal with changing market circumstances. Some commenters expressed concern that a signed authorization requirement may stifle the creation and development of payment system innovations.

The final rule sets forth the authorization requirements for ECK transactions under § 205.3(b)(2)(ii). Generally, a consumer authorizes a one-time EFT (in providing a check to a merchant or other payee for the MICR encoding) when the consumer receives a notice that the transaction will be processed as an EFT and goes forward with the transaction. This guidance was originally in proposed comment 3(b)(2)-1. (Existing comment 3(b)-3 is deleted.) The phrase "completes the transaction" is replaced with "goes forward with the transaction" to clarify that it is not necessary for the transaction to clear or settle, for example, in order for authorization to occur. Section 205.3(b)(2)(ii) also addresses the possibility that a payee might elect to obtain a consumer's authorization either to convert a check provided as payment to an EFT or to process the check as a check transaction. See also comment 3(b)(2)-2 (further discussed below).

For ARC transactions, a payee (such as a utility company) obtains a consumer's authorization when it provides notice of its intent to convert checks received as payment – for example, on a monthly billing statement or invoice – and the consumer provides or mails a check as payment.

For transactions at POS, the final rule requires payees to post the notice in a clear and prominent location. The requirement for posted signage is necessary to alert consumers that a check provided as payment will be converted to an EFT before the consumer selects a payment method. The Board believes that providing this notice on a sign enables the consumer to authorize the ECK transaction after being given prior notice. The final rule also requires merchants and other payees at POS to provide consumers with a copy of the notice in a form the consumer can keep at the time of the transaction. For example, merchants and other payees could provide the notice on the receipt given to the consumer. The written receipt allows consumers to refer to the notice later, if necessary.

The final rule does not require merchants or other payees at POS to obtain a consumer's signed authorization for ECK transactions. The Board believes that a signed authorization requirement would provide minimal additional benefit given that consumers will be given notice that their checks will be converted at two different points during the ECK transaction, first through posted signage which consumers can read prior to providing a check as payment, and second on a receipt provided to the consumer, presumably after the check has been provided to the merchant. In addition, the periodic statement provided by the consumer's bank will typically reflect ECK transactions in a different manner than check transactions.

New comment 3(b)(2)-1 provides that a payee at POS does not violate the requirement to provide a copy of the check conversion notice to the consumer if the payee is unable to provide notice because of a bona fide unintentional error, so long as the payee maintains procedures reasonably adapted to avoid such occurrences. Thus, for example, a payee will not be deemed to

have violated the regulation if it cannot provide a paper notice if its terminal printing mechanism jams, provided that the payee maintains procedures reasonably adapted to avoid such occurrences.

<u>Authorization language</u>

Proposed comment 3(b)(2)-2 provided that a payee must obtain the consumer's authorization to use information from his or her check to initiate an EFT or, alternatively, to process a check. The comment is adopted, largely as proposed. Model notices are provided in Appendix A-6 to assist merchants and other payees in complying with the requirements. <u>See</u> § 205.3(b)(2)(iv). Regulation E coverage of ECK transactions continues to be predicated on the consumer's authorization to allow the merchant or other payee to use a check as a source of information to initiate an ECK transaction.

Due to processing or technical errors, a transaction authorized as an ECK transaction ultimately may not be processed as an EFT. Furthermore, in some cases, a payee may decide to process the original check or create a demand draft, or the payee may choose to create a substitute check in accordance with the Check Clearing for the 21st Century Act (Check 21).[1] Currently, if a payee obtained a consumer's authorization solely to initiate an EFT using information from the consumer's check, the payee may have difficulty processing the same document as a check because such an action would arguably fall outside the consumer's payment instructions. Thus, without the consumer's authorization to alternatively process the transaction as a check, the payee may not be able to obtain payment. In other cases, a merchant or payee operating in multiple states may choose to pilot ECK in some locations while processing the payments as checks in others. To address these and similar concerns, and to provide flexibility, the Board proposed three authorization approaches for ECK transactions.

First, the Board proposed to allow a payee to obtain a consumer's authorization to use information from his or her check to initiate an EFT or, alternatively, to process the transaction as a check. <u>See</u> proposed Model Clause A-6(a). The Board specifically solicited comment, however, on whether this alternative authorization approach may result in any consumer harm or create any other risks. In particular, comment was solicited on whether payees that obtain alternative authorization should be required to specify the circumstances under which a check that can be used to initiate an EFT will be processed as a check. Second, the Board proposed an optional authorization clause for use by payees that intend to convert all checks to ECK transactions. <u>See</u> proposed Model Clause A-6(b). Third, the Board proposed an optional authorization clause for use by payees that choose to disclose the specific circumstances when checks will not be converted to ECK transactions. <u>See</u> proposed Model Clause A-6(c).

Most industry commenters supported the alternative authorization approach as illustrated in proposed Model Clause A-6(a), stating that the approach provides needed flexibility. The majority of these commenters did not believe any consumer harm would result from the lack of specification of circumstances under which check conversion would or would not occur. One commenter did not believe consumers would be confused about their rights since many account-holding financial institutions list EFT and check transactions separately on periodic statements

---

[1] Pub. L. 108-100, 117 Stat. 1177 (codified at 12 U.S.C. 5001-5018).

given to consumers.  A few commenters stated that consumers will have sufficient protections regardless of how the transactions are processed.

Some industry commenters supported alternative authorization, but stated that the Board should also require payees to disclose the circumstances under which conversion will not occur. One such commenter believed the disclosure of the specific circumstances would eliminate any risk of consumer harm.

One federal enforcement agency observed generally that consumers may not understand the differences between checks and ECK transactions or the protections that apply to each, but did not otherwise express a view on the merits of permitting alternative authorization.  This commenter thought that focus group testing of the model clauses would be useful to determine what information consumers understand.

A few commenters opposed the alternative authorization clause as unclear and potentially confusing to consumers.  According to one industry commenter, confusion arising from an alternative authorization may cause consumers to instruct their financial institutions to state that ECK transactions were unauthorized.  This commenter therefore believed the rule should require the authorization notice to specify the circumstances when conversion would not occur. According to another commenter, requiring payees to specify the circumstances when a check will be processed as a check is consistent with the purpose of the EFTA—for consumers to know their rights, responsibilities, and liabilities when they engage in EFT services.  This commenter believed such disclosure also enhances consumer understanding by making it clear that there are different methods to collect checks and by providing greater certainty as to which method is most likely to apply to a particular transaction.  The commenter stated that given the efficiency of check conversion, there should be limited circumstances to disclose.  Accordingly, the commenter requested that the Board delete Model Clause A-6(a) as an option.

Some industry commenters supported the approach illustrated in proposed Model Clause A-6(b) for when a payee converted all checks, as long as the use of the clause is optional.  One commenter believed the clause unworkable absent additional authorization to process the transaction as a check where the ECK will not clear for technical reasons.

A few industry commenters also supported the specific authorization approach illustrated in Model Clause A-6(c) as long as it is optional.  Other industry commenters did not believe the clause would provide a significant benefit to consumers.  Several commenters believed a specific disclosure would be highly detailed and complex; if circumstances changed new disclosures would be required.  One consumer group commenter was concerned that the burden of providing this notice could result in payees favoring substitute checks under Check 21 which they believed would provide fewer consumer protections.  A few industry commenters thought the clause should not be adopted.

A few industry commenters stated that all three model clauses should be retained for flexibility.  Other commenters believed that all three clauses should be consolidated to address various payment options available to payees.  Several commenters supported having one model notice to avoid confusing consumers.  Many commenters expressed concern about the length of

the notices. A few commenters requested additional guidance on the clear and conspicuous standard as it pertains to the notices.

In the final rule, Model Clause A-6(a) is retained as proposed, but proposed Model Clauses A-6(b) and (c) have been consolidated in a single Model Clause A-6(b) for simplicity and to facilitate compliance by payees. Model Clause A-6(a) may be used in all instances, including when a payee will process a check as an EFT in all circumstances, when the transaction is processed as a check for technical reasons, or because a payee simply chooses to process the transaction as a check. While the Board believes that most payees will likely choose to use Model Clause A-6(a) in all cases, the Board is aware that some payees may want to provide more specific information concerning their ECK practices for business reasons, such as for customer service and education, as well as to reduce possible consumer inquiries. Model Clause A-6(b) offers that flexibility. Thus, for example, payees may choose to use Model Clause A-6(b) to disclose the circumstances under which they will not process a check as an EFT, such as when it is impossible for technical or other processing reasons.

Model Clauses A-6(a) and (b) have also been revised to clarify their application to transactions where a consumer's check is provided as payment. Some commenters expressed concern that without this revision, consumers might mistakenly believe the notice applied to preauthorized transfers—where a consumer provides a check and a signed authorization in advance to authorize future payments. See § 205.10.

Consistent with § 205.4(a)(1), notices provided to consumers regarding check conversion must be clear and readily understandable. For example, in ARC transactions, notices in small print and buried in the middle of unrelated information would likely not meet the standard. Payees may also consider using headings preceding the notice to call attention to the information presented. For POS transactions, signage informing consumers about check conversion should not be obscured by other information or signs that may also be located at POS.

Notice for each transfer

ECK transactions are one-time, and not preauthorized, transfers. Therefore, under the final rule, a notice must be provided and an authorization must be obtained from the consumer for each transfer. Section 205.3(b)(2)(ii) contains the general rule that the person initiating an ECK transaction must provide notice of check conversion to the consumer before each transfer.

Some industry commenters stated that while it may be appropriate to require notice for each transfer for most ECK transactions, there are certain circumstances where one advance notice may suffice. Coupon books were the most frequently-cited examples. Lenders provide coupon books to consumers typically for mortgages, automobile loans, personal loans, and other recurring loan payments. According to some commenters, coupon books do not present the same notice opportunities as POS and ARC transactions because they are provided in advance and include coupons for several payments. Some credit card issuers suggested that it may be similarly appropriate to allow a consumer to contract with its card issuer for regular ECK payments rather than requiring a notice to be sent on or with each periodic statement sent to the consumer. A few commenters stated that recurring notice is appropriate only for POS

transactions. One commenter stated that the consumer benefit of receiving a notice with each periodic statement is negligible compared to the ongoing cost to institutions.

Because a coupon book is designed so that a consumer must detach a coupon from the book and provide the coupon with each payment, the Board believes that it is unnecessary to require that a separate notice of check conversion be printed on each coupon. New comment 3(b)(2)-3 provides that for coupon books, a notice placed on a conspicuous location of the coupon book that the consumer can retain is deemed to constitute the provision of notice on each coupon that accompanies a check provided as payment, for purposes of obtaining a consumer's authorization to convert each check. The notice must be placed on a location of the coupon book that a consumer can retain – for example, on the first page, or inside the front cover. The Board believes this new comment will facilitate compliance with the requirements of the Act and regulation.

Unlike coupon books which contain several payment coupons and are sent once near the beginning of the payment period, periodic statements for credit card accounts are typically sent on a monthly basis. Thus, the Board believes that credit card issuers have the capability of providing a notice of check conversion with each statement without an undue burden. In contrast, payees that send coupon books may not otherwise send monthly information; thus, requiring a separate monthly notice could be costly for these payees. Accordingly, comment 3(b)(2)-3 in the final rule is limited to coupon books.

If a coupon book is issued before the effective date of the final rule, and will cover a time period when notice otherwise must be provided under the final rule, payees may provide a one-time notice to obtain the consumer's authorization to convert each check submitted with a coupon. For example, a payee may provide a separate mailing informing the consumer that by mailing a check with each payment coupon included in the book, the consumer authorizes the payee to convert each check provided as payment to an EFT. Without such relief, payees would have to re-issue coupon books at considerable expense in order to comply with the new rule.

The final rule also clarifies that the notice regarding a payee's intent to collect a service fee for insufficient or uncollected funds via an EFT and the notice providing additional information about the nature of ECK transactions (further discussed below) must also be provided for each transfer. However, the special exception regarding coupon books would also apply to notices regarding the electronic collection of service fees for insufficient or uncollected funds and the nature of ECK transactions.

<u>Imputed notice</u>

Proposed § 205.3(b)(2)(ii) provided that obtaining authorization from the consumer holding the account for which a check may be converted constitutes authorization for all checks provided for a single payment or invoice for that account. Proposed comment 3(b)(2)-4 stated that notice of check conversion to the person holding the account for which a check may be converted may be imputed to anyone who writes a check as payment for the particular invoice or bill. In the final rule, comment 3(b)(2)-4 is adopted with certain revisions for clarity. The

guidance in proposed § 205.3(b)(2)(ii) is also moved to comment 3(b)(2)-4, with some revisions for clarity.

All commenters who addressed the issue of imputed notice supported the proposal. One commenter noted that the rule is consistent with current industry practice. Another commenter stated that complying with a different rule would be unduly burdensome, if not impossible. A few commenters supported the proposal, but stated that alternative authorization would also be necessary to accommodate payees who may choose not to process multiple transactions all as EFTs. A few commenters also suggested that the authorization of the person holding the billing account should apply to all checks received prior to the next bill, not just to checks related to the particular invoice.

In the final rule, comment 3(b)(2)-4 provides that notice to the consumer listed on the billing account constitutes sufficient notice to convert all checks provided in payment for the billing cycle or the invoice for which notice has been provided, whether the check(s) is received from the consumer or someone else for that account. The notice applies to all checks submitted as payment until the provision of notice on or with the next invoice or statement. Thus, if a merchant or other payee receives a check as payment from the consumer listed on the billing account after providing notice that the check will be processed as a one-time EFT, the authorization from that consumer constitutes authorization to convert all other checks provided for a single invoice or statement.

Other required notices for ECK transactions may also be similarly imputed to any other consumer who may provide a check for the same billing cycle or invoice if such notices are provided to the consumer listed on the billing account. Thus, for example, a notice to the consumer on the billing account informing the consumer that a service fee for insufficient or uncollected funds will be debited via an EFT from the consumer's account constitutes notice to obtain authorization for electronically collecting the fee to any other consumer who may provide a check for the same billing cycle or invoice.

Additional ECK disclosures

Consistent with the EFTA's purpose to enable consumers to understand their rights, liabilities, and responsibilities concerning EFT services, and given the unique characteristics of ECK transactions, the Board believes it is appropriate to provide consumers with additional information to help them understand the nature and potential consequences of an ECK transaction. Proposed § 205.3(b)(2)(iii) thus required a person that initiates an ECK transaction to provide a notice to the consumer that when a check is used to initiate an electronic fund transfer, funds may be debited from the consumer's account quickly, and, as applicable, that the consumer's check will not be returned by the financial institution holding the consumer's account. Under the proposal, this information would be provided at the same time a notice is provided to obtain authorization for the underlying ECK transaction. Section 205.3(b)(2)(iii) is adopted as proposed, with some revisions to address commenter concerns. Proposed comment 3(b)(2)-3 is re-designated as comment 3(b)(2)-5, and provides additional guidance to facilitate compliance.

Consumer group commenters stated that the additional information answered many of the common questions they receive from consumers about ECK transactions; thus, they believed that the additional information would help avoid consumer confusion and enhance consumer understanding of ECK transactions.  A federal enforcement agency similarly noted that consumers may be more willing to engage in ECK transactions if they better understand them.  In particular, the agency stated that the disclosure regarding the quick debiting of deposit accounts through ECK transactions could help consumers avoid the possibility of overdrafts for insufficient funds.

Some industry commenters requested that the Board revise the requirement to state instead that the transaction will be reported on the consumer's periodic account statement.  One industry commenter stated that much of the consumer education responsibility for ECK transactions should be borne by the consumer's financial institution.  A few industry commenters were concerned about the length of the disclosures, particularly in combination with the authorization disclosure, and expressed concern that consumers may be discouraged from reading them.  One industry commenter stated that the disclosures may not be feasible as an ongoing requirement.  Another industry commenter expressed concern about the cost of reprogramming terminals.  One industry commenter thought the Board should require financial institutions to include the disclosures in their account agreements or on each periodic statement that includes an ECK transaction.

A number of industry commenters opposed the proposed disclosure that states when a consumer's check is used for an ECK transaction, the transaction may clear quickly.  Many of these commenters stated that in the majority of cases an EFT and a check will clear in roughly the same period of time.  Other commenters stated that under Check 21, checks may clear as fast or faster than EFTs, and expressed concern that the disclosure may mislead consumers.  A few commenters stated it might be impossible to explain the meaning of "quickly" in different circumstances.

Many industry commenters also opposed the proposed disclosure that the consumer's check will not be returned by the consumer's financial institution.  The majority of these commenters stated the disclosure would be misleading, particularly to consumers whose checks currently are not returned by their financial institutions under the terms of their account agreements.  A few commenters asserted the disclosure might become less significant to consumers in light of Check 21.  One commenter believed that consumers may confuse the disclosure with similar statements from their financial institution about check handling under Regulation CC, as amended to implement Check 21.

As the payment system evolves, consumers' checks are being used differently than in the past, and consumer rights with respect to EFT transfers are different than those for check transactions.  Given the unique characteristics of ECK transactions, the Board believes it would be beneficial to provide additional information to consumers to help them better understand the nature of these transactions.  The additional information highlights and may draw consumers' attention to some of the key differences in the way payments are handled under the ECK process, and possibly reduce consumer confusion about ECK transactions.  Moreover, the Board notes that some payees, particularly in the ARC environment, are currently providing this information

to their customers to help reduce consumer inquiries and complaints. Requiring this notice could facilitate consumer understanding by ensuring that all consumers who engage in ECK transactions receive this information. Accordingly, the Board is exercising its authority under Sections 904(c) and 904(d)(1) of the EFTA and adopting the proposed notice in the final rule, with certain modifications to address commenters' concerns.

The Board recognizes that a check may be processed as fast or faster than an ECK transaction in some instances based on current industry practices and potential changes in check processing facilitated by the Check 21 Act. Nevertheless, the Board believes it is important to draw a consumer's attention to the fact that an ECK transaction "may" clear quickly. The purpose of the notice is to emphasize to consumers the importance of having sufficient funds in their accounts at the time of the transaction, since many consumers may still believe that use of a check will result in a significant time lag between the time the consumer provides a check as payment and when funds are in fact debited from the consumer's account. To address commenter concerns about potential comparisons with check processing, the notice in § 205.3(b)(2)(iii) has been revised to state that funds may be debited from consumers' accounts as soon as the same day payment is received.

Section 205.3(b)(2)(iii) also retains the requirement to notify consumers that they will not receive their checks back from their financial institution if their checks are converted. The disclosure addresses complaints received by the Board from consumers expressing confusion about not receiving their checks back in ECK transactions. In particular, some consumers may rely on the checks they receive back with their periodic statements for account reconciliation and recordkeeping purposes. Comment 3(b)(2)-5 clarifies that the statement that a check will not be returned by the consumer's financial institution is not required at POS, if, as is typically currently the case, the merchant returns the check to a consumer.

To provide flexibility and address the concerns about the length of ECK disclosures, payees at POS may provide the notice in § 205.3(b)(2)(iii) on posted signage, and need not also provide the notice on the receipt provided to the consumer at the time of the transaction. However, payees in ARC transactions must provide the notice with the general notice to obtain consumer authorization for the ECK transaction. The Board expects that ARC payees will likely provide the combined notice on a billing statement or invoice. As provided in § 205.3(b)(2)(iv), model clauses are provided in Appendix A-6 to help payees comply with the additional disclosure requirements. Model Clause A-6(c) sets forth two different formulations for the statement regarding when funds may be debited from a consumer's account, depending on where the payment is made. If the payment is made at POS, the statement refers to the possibility that funds may be debited from the consumer's account as soon as the same day the consumer makes the payment. For ARC transactions, the statement refers to the date that the payee receives the payment.

Consistent with § 205.4(a)(1), and as stated above in the context of the notice to obtain consumer authorization for an ECK transaction, the notice provided under § 205.3(b)(2)(iii) to consumers about the nature of ECK transactions must be clear and readily understandable. For example, notices in small print and buried in the middle of unrelated information would likely

not meet the standard. Payees may also consider using headings preceding the notice to call attention to the information presented. If payees elect to provide the information under § 205.3(b)(2)(iii) separately on a sign, the notice should not be obscured by other information or signs that may also be located at POS.

As stated above, with ECK transactions, consumers' checks are being used differently than in the past, and consumers may not be aware that the conversion of their checks to EFTs may impact the collection time for the payment, or that they will not receive their checks (or images of their checks) back with their statements as has been the case for check transactions in the past. Thus, the Board believes that these additional disclosures are appropriate at present. Moreover, many payees are already providing similar disclosures to reduce possible consumer inquiries. Nevertheless, the Board expects that over time, consumers will become more familiar with ECK transactions, thereby reducing the need for the additional information. Thus, the final rule provides a sunset date of three years from the mandatory compliance date of January 1, 2007 for the final rule, after which time payees will no longer be required to provide the notice set forth in § 205.3(b)(2)(iii).

Transactions initiated by mistake

The supplementary information to the proposed rule clarified that where a merchant or other payee initiates an EFT in error, the transaction would not be covered by Regulation E where the transaction does not meet the definition of an EFT. Few commenters addressed the statement, but one requested clarification because the inability to process an item is not necessarily the result of an "error." The Board agrees that the word "error" has a particular meaning in the EFTA, Regulation E and other rules, and that in some cases a transaction may not be able to be processed as an EFT for other reasons. Accordingly, the Board believes that the statement applies to transactions where a payee mistakenly initiates an ECK transaction, such as when the payee attempts to convert a money order. Such a transaction is not subject to the coverage of the EFTA and Regulation E, even if initiated as an ECK transaction.

Collection of Service Fees Via Electronic Fund Transfer

In the proposal, comment 3(b)-3 was added to clarify that an EFT from a consumer's account to collect a service fee due to insufficient funds is covered by Regulation E, and must be authorized by the consumer. Under the proposal, the provision of notice to the consumer, coupled with the consumer's decision to proceed with the transaction, would constitute authorization for the debit. This provision has been adopted in the regulation in new § 205.3(b)(3), which also requires payees to notify consumers about the specific amount of the fee in order to obtain the consumer's authorization for the transaction. Consistent with the authorization requirement at POS for ECK transactions, the final rule requires that where a service fee for insufficient or uncollected funds in connection with a POS transfer may be collected via an EFT, the notice must be posted in a prominent and conspicuous location, and a copy of the notice must be provided to the consumer. Comment 3(b)(3)-1 clarifies that the requirement to obtain the consumer's authorization does not apply to fees imposed against the consumer's account by the consumer's account-holding institution for paying overdrafts or returning a check or EFT unpaid.

The majority of commenters generally agreed that EFTs initiated to collect service fees for insufficient funds should be covered by Regulation E. A few industry commenters stated coverage was appropriate as long as a merchant or other payee could obtain authorization of the service fee when it provides notice to the consumer that the fee will be debited electronically from the consumer's account, and the consumer decides to proceed with the transaction. Other industry commenters generally supported the notice requirement, but believed the Board should also require signed authorization. Several industry commenters requested clarification that additional authorization requirements may be established by payment system rules. A few commenters requested clarification that the proposed rule did not intend to address "NSF" fees assessed by a consumer's financial institution for returning a check unpaid. Some industry commenters requested revising the comment to clarify that a check might be returned for reasons other than "insufficient" funds.

Consumer group commenters opposed the proposed comment. These commenters stated that notice and the consumer writing a check alone should not be sufficient to authorize the debiting of service fees, noting that while a consumer may reasonably anticipate a withdrawal from his or her account for the face amount of the check, the consumer would not expect an additional debit for the fee, absent additional prior, written authorization. Consumer groups also stated that a written, signed authorization requirement would encourage consumers to exercise more care in determining their actual balances before making a payment.

Some industry commenters also opposed the proposed comment. One commenter asserted that providing notice at POS would not sufficiently inform the consumer of the possibility that a service fee could be debited electronically from the consumer's account. A few commenters opposed the comment as inconsistent with the NACHA rule, which requires written, signed authorization for collection of service fees via an EFT. A couple of commenters believed it important to require signed authorization so a consumer will know and understand the fee imposed. One commenter expressed the concern that some payees believe the current Regulation E notice equals authorization comment grants a substantive right to collect a service fee, notwithstanding other federal or state law requirements that might apply.

Proposed comment 3(b)-3 has been moved to the regulation as new § 205.3(b)(3) in the final rule. In general, § 205.3(b)(3) provides that a consumer authorizes the electronic collection of a fee for a check or EFT returned due to insufficient funds when the consumer receives notice of a payee's intent to collect the fee via an EFT, and the consumer goes forward with the transaction. The final rule also requires payees to include the specific amount of the fee imposed in the notice provided to consumers to ensure that consumers are informed of the amount of the fee they may be charged in the event they have insufficient funds in their account. Section 205.3(b)(3) requires payees to obtain a consumer's authorization for the debit regardless of whether the underlying transaction is an EFT or is a check transaction, as long as the payee intends to collect a service fee for insufficient funds via an EFT to the consumer's account. See also comment 3(c)(1)-1.

In addition, section 205.3(b)(3) has been further revised to address some commenters' concerns. First, the provision was not intended to address fees assessed on a consumer's account

by the consumer's financial institution for the return of a check or EFT unpaid (commonly known as "NSF fees"), but rather, to address service charges assessed by a <u>payee</u> because the consumer's check or EFT was returned unpaid.  Accordingly, references to "NSF fees" in the proposed comment have been deleted and replaced with "service fee(s)" in the final rule.  New comment 3(b)(3)-1 further provides that the authorization requirement does not apply to fees imposed against the consumer's transaction account by the consumer's account-holding institution for paying overdrafts or returning a check or EFT unpaid.  (However, where a financial institution holds the consumer's deposit or checking account and also acts as a payee, such as in connection with a loan or credit card account, it would be required to obtain the consumer's authorization in order to collect a service fee for insufficient or uncollected funds in connection with the underlying transaction, but not to collect any separate service fee that may be assessed against the deposit or checking account for returning the check or EFT unpaid.)

Second, because a check or EFT may be returned for reasons other than insufficient funds in the consumer's account, § 205.3(b)(3) states that the rule applies where an EFT or check is returned for "insufficient or uncollected" funds.

Third, consistent with the authorization requirements for the ECK transaction, the Board is exercising its authority under Sections 904(c) and 904(d)(1) of the EFTA to require payees at POS to provide notice of their intent to collect service fees for insufficient or uncollected funds via EFT, and to disclose the amount of the fee, on signage posted in a prominent and conspicuous location at POS.  A copy of the notice must also be provided to the consumer at the time of the transaction, such as on the sales receipt.  Payees in ARC transactions will typically provide written notice on a billing statement or invoice.  Model Clause A-6 contains model language that payees may use to obtain a consumer's authorization for the collection of the service fee for insufficient or uncollected funds via an EFT.

The final rule does not require payees to obtain a consumer's signature to authorize the collection of service fees for insufficient or uncollected funds via an EFT.  Particularly at POS, the Board believes the added benefit of a signature would be minimal in light of the requirements to provide notice of the intent to collect the service fee via an EFT both on posted signage, and on a receipt provided to the consumer at the time of the transaction.  The Board further notes that § 205.3(b)(3) addresses only the requirement that a payee obtain a consumer's authorization for a service fee for insufficient or uncollected funds the payee intends to collect via EFT.  The final rule does not, however, address whether a payee has a substantive right to collect the service fee—that is a matter of state or other law.  The Board notes that other federal or state laws, such as the Fair Debt Collection Practices Act, as well as payment system rules, may impose additional requirements.

## 3(c) Exclusions From Coverage

When payees re-present checks electronically, they may also seek to debit a service fee for insufficient funds via EFT from the consumer's account.  Although the electronic re-presentment of the returned check (RCK) is not covered by Regulation E because the transaction was originated by check, the separate electronic debit of the service fee <u>is</u> covered by the regulation.  Proposed comment 3(c)(1)-1 clarified that a consumer authorizes the debit of the

service fee when the consumer goes forward with the transaction after receiving notice that the fee will be collected electronically. No commenters opposed the clarification. Comment 3(c)(1)-1 is revised, consistent with § 205.3(b)(3), to add a reference to "uncollected" funds and to provide that authorization at POS for the electronic debit of the service fee from the consumer's account in connection with a re-presented check requires notice posted on signage, with a copy of the notice provided to the consumer.

## Section 205.5 Issuance of Access Devices

Section 911 of the EFTA, which is implemented by § 205.5 of Regulation E, generally prohibits financial institutions from issuing debit cards or other access devices except (1) in response to requests or applications or (2) as renewals or substitutes for previously accepted access devices. Comment 5(a)(2)-1 generally provides that a financial institution may not issue more than one access device as a renewal of or substitute for an accepted device (the "one-for-one rule"). Section 205.5(b) provides, among other things, that any access device issued on an unsolicited basis must not be validated at the time of issuance. Under the proposal, comment 5(b)-5 clarified that a financial institution may issue more than one access device in connection with the renewal or substitution of a previously accepted access device, provided it complied with the conditions set forth in § 205.5(b) for the additional unsolicited devices. The proposal retained the general one-for-one rule in comment 5(a)(2)-1; however, a cross-reference to proposed comment 5(b)-5 was added. The revisions are being adopted substantially as proposed, with some modifications to address commenters' concerns.

Most commenters addressing this issue supported the proposal. One commenter asserted that since liability for unauthorized use is on a per-account (not per-device) basis, issuing additional devices would not impose added risk on the consumer. Another commenter agreed that an additional access device should be issued in unvalidated form, but suggested that new initial Regulation E disclosures should not be required to accompany the additional device. (One of the requirements for issuing an unsolicited access device under § 205.5(b) is to provide the initial disclosures required by § 205.7 that will apply to the device. See § 205.5(b)(3).) One commenter suggested that the proposed commentary changes be expanded to provide financial institutions flexibility to replace access devices having limited functions with devices having additional functions. For example, cards usable only at ATMs could, under this approach, be replaced with cards usable at POS as well.

A few commenters suggested the Board clarify that when an additional access device is issued at the time of replacement or substitution, both the additional device and the device that replaces the accepted access device may be issued in unvalidated form and a single validation procedure may be used to validate both devices. Under such a procedure, the consumer would not have the option to validate only the device replacing the existing device and refuse to validate the additional device; the consumer would have to choose to validate both devices or neither device.

The revisions to the commentary regarding the issuance of additional access devices are adopted as proposed, with a few clarifying changes as described below. Unlike credit cards, a consumer's own funds are at risk of loss in the event of unauthorized use of a debit card or other

access device.  The potential for unauthorized use may increase if validated cards are intercepted in the mail and consumers are unaware that they may be receiving multiple cards as replacements for an existing access device.  The validation requirement of § 205.5(b) limits the risk of monetary losses from the theft of debit cards sent through the mail.  Although there would be no increase in a consumer's liability where multiple access devices are issued, asserting a claim of unauthorized use can be inconvenient and time-consuming, and, at least temporarily, the consumer may be deprived of needed funds.  Therefore, the Board believes the benefits afforded by the one-for-one rule and the validation requirements of § 205.5(b) are critical in the context of debit cards, and outweigh any benefits of providing greater flexibility to issue access devices.  In addition to the validation requirement in § 205.5(b), the Board notes that where additional access devices are issued unsolicited, whether in connection with the issuance of a replacement or substitute device or otherwise, the other provisions of § 205.5(b), including the requirement to provide new initial disclosures, also apply.  (See, however, comment 2(a)-2, providing that the term "access device" does not include a check used as a source of information to initiate an EFT.)

With respect to the suggestion to expand the proposed comment to provide financial institutions with flexibility to replace access devices with limited functions with devices having additional functions, comment 5(a)(2)-1 already addresses the issue; institutions are permitted to expand functions upon replacement or substitution of access devices.  When the proposed revisions to comment 5(a)(2)-1 were issued, existing commentary language on this point was not included for the sake of brevity.  To clarify this matter, the language in question is set forth in full in the text of the final commentary revisions.  Also, the language is modified slightly to make clear that either the access device replacing the existing device, or the additional access device (or both), may provide expanded functions compared to the existing device.

Regarding validation procedures, an institution may require a consumer to choose to either validate all access devices provided by an issuer, including the replacement and any additional devices, or validate none of the issued devices.  Also, although an institution is permitted to issue a validated access device to replace an existing accepted access device, the institution may choose instead to issue the replacement device in a form that requires validation.  Furthermore, an institution may choose to link the validation of one access device with the validation of another one.  Accordingly, comment 5(b)-5 is revised to include a clarification on this issue.  The comment also notes that an institution using such a validation procedure should disclose to the consumer in a clear and readily understandable manner that the single validation will validate both access devices, to ensure that the consumer will not, for example, improperly discard the additional, now validated, device.

**Section 205.7 Initial Disclosures**

**7(a) Timing of Disclosures**

Electronic check conversion transactions are a new type of EFT requiring new disclosures.  See discussion below under § 205.7(c).  The Board proposed to revise comment 7(a)-1 to provide that an institution may choose to provide disclosures about ECK transactions

early, i.e., prior to the first ECK transaction involving the consumer's account. Commenters supported the proposed revision. One trade association representing credit unions observed that early notification is a cost-effective way of enabling institutions to establish a single means of notifying and educating consumers about their rights concerning electronic fund transfers. Comment 7(a)-1 is adopted as proposed, with a minor revision. See also comment 7(a)-2 (permitting an institution that has not received advance notice of a third party transfer to provide required disclosures as soon as reasonably possible after the first transfer).

## 7(b) Content of Disclosures

The Board proposed to clarify that financial institutions must list ECK transactions among the types of transfers that a consumer can make. See proposed comment 7(b)(4)-4. As further discussed below under § 205.7(c), the Board adopts comment 7(b)(4)-4 as proposed.

## 7(c) Addition of Electronic Fund Transfer Services

Former comment 7(a)-4 stated that if an EFT service is added to a consumer's account and is subject to terms and conditions different from those described in the initial disclosures, disclosures for the new service are required. Under the final rule, as proposed, this interpretation is moved to § 205.7(c) of the regulation for consistency with other regulations. See, e.g., § 226.9(b)(2) of Regulation Z. New comment 7(c)-1 is adopted as proposed to provide that ECK transactions are a new type of transfer requiring new disclosures to the consumer, to the extent applicable. The model clauses for initial disclosures are revised to provide guidance to institutions regarding their disclosure obligations to consumers about ECK transactions. See Appendix A, Model Clauses in A-2.

The Board proposed comment 7(c)-1 to address industry uncertainty about the extent of an account-holding institution's disclosure obligations to new and existing consumers regarding ECK transactions. As stated in the proposal, new disclosures about ECK transactions are necessary because a consumer's check can be used differently than in the past, that is, information from the check can be used to initiate EFTs. Industry comments generally favored including information about ECK transactions in initial disclosures, and many noted that they already have adjusted their disclosures to reflect the fact that ECK transactions are a new type of transfer that may be made to or from the consumer's account. One commenter stated that ECK transactions should not be treated as a new type of transfer because the consumer intended to pay by check, rather than by EFT. The Board notes, however, that if a merchant or other payee provides proper notice about the transaction (see § 205.3(b)(2)), a consumer, by providing the check as payment, authorizes the use of the check as a source of information to initiate a one-time EFT from the consumer's account. Comment 7(c)-1 is thus adopted as proposed.

To assist institutions in implementing the new disclosure requirements, the Board also proposed model initial disclosure language to reflect that one-time EFTs are a new type of transfer that may be made from a consumer's account using information from the consumer's check, and to further instruct consumers to notify account-holding institutions when an unauthorized EFT has occurred using information from their check. Commenters supporting the

new model language stated that the proposed language was clear, concise, and helpful.  A few commenters requested sufficient time for institutions to make the new disclosures.

A few industry commenters stated that certain of the disclosures were unnecessary.  Two commenters observed that referring specifically to ECK transactions in the initial disclosures regarding error resolution might mislead consumers to believe that they only had error resolution rights when their check is converted to an EFT.  Another commenter, however, believed that including information about ECK transactions in the liability provisions was appropriate, but this commenter objected to listing ECK transactions as a new type of transfer since the consumer intended to pay by check, and not by EFT, and therefore ECK transactions should not be considered to be EFTs.  The Board notes that the model language informs consumers that, in addition to notifying their bank when their card or code has been lost or stolen, or when money has been transferred from their account without their permission, they may also contact their institution if an unauthorized transfer has been made using the information from their check.

Consumer groups commented that the new model disclosure language was helpful, but urged the Board to also include other practical information about the nature of ECK transactions, and to include information about consumers' rights under check law to differentiate such transactions from ECK transactions.  For example, while the current model disclosures describe the 60-day time frame for consumers to exercise their error resolution rights with respect to EFTs, including ECK transactions, shorter time periods for asserting errors may apply to checks processed by means other than check conversion.  While institutions may choose to provide consumers with additional information regarding their rights when a check is processed by other means, the model disclosures are solely intended to address consumers' rights under the EFTA when the transaction involves an EFT to the consumer's account.  Other error resolution rights which may exist under other laws, including state check law, are outside the scope of this rulemaking.  Consumer groups further suggested that the error resolution notice should state more clearly that an institution "must" correct any error within 10 business days, rather than use the current language that an institution "will correct any error promptly."  However, under certain circumstances, including where an institution provides a provisional credit to the consumer's account or where the error involves a new account, an institution may extend their investigation period to up to 90 days.  Therefore, the Board believes the current language is more accurate.

Consumer groups also urged the Board to subject the model notices to a complete review for readability and understandability.  For instance, consumer groups observed that the term "code" may not be as well understood as "PIN" or even "access code."  Based on the Flesch-Kincaid scale, the model initial disclosures in the final rule score at a 9.9 grade level, with a Flesch reading ease score of 60.3 on a 100.0 scale, indicating a high level of readability.  The Board agrees that in general consumer disclosures benefit from consumer testing, and anticipates that testing of this and other notices could be made part of a future comprehensive review of the regulation.

One trade association and a company that provides compliance forms for institutions expressed their concerns about the scope of the proposed disclosures, stating that the Board's model disclosures were not broad enough to address other types of third-party initiated EFTs

which may be initiated using account information from a check, in particular those initiated via a telephone or the Internet. As noted previously in the discussion of § 205.3(b), while telephone and Internet transactions are covered by Regulation E, the proposed rule was intended to address ECK transactions only; other types of EFTs are not addressed by these provisions in the final rule.

A few industry commenters asserted that since most banks have considered electronically converted checks to be EFTs since adoption of the 2001 commentary, and have already amended their initial disclosures to include ECK transactions, institutions should not be required to amend their disclosures again to include additional detail that is only applicable to ECK transactions. These institutions also stated that the cost of reprinting and mailing the revised disclosures would far exceed any consumer benefit of receiving a notice that explains a process that financial institutions have already been following. Two commenters asked the Board to clarify that the introduction of ECK services would not require change-in-terms notices to existing consumers, because none of the terms of the underlying account agreement are affected by the new type of transfer.

Under the final rule, for customers opening accounts after the mandatory compliance date of January 1, 2007, institutions must include in initial disclosures that ECK transactions are among the types of transfers that a consumer can make. Where institutions have already amended their disclosures to notify their consumers that ECK transactions may be made from their account, they would not be required to make new disclosures about such transactions to those consumers. New disclosures to existing customers would be required to be provided <u>after</u> the mandatory compliance date, however, if an institution has not disclosed to those consumers that ECK transactions may be made, even if other terms of the underlying account agreement would equally apply to the new type of transfer. <u>See</u> comment 7(c)-1.

The Board specifically solicited comment on whether six months following adoption of the final rule would provide sufficient time for financial institutions to revise their disclosures to comply with the rule. The vast majority of industry commenters urged the Board to extend the time for compliance to one year. The final rule reflects commenters' suggestions; institutions will have until the mandatory compliance date of January 1, 2007 to revise their initial disclosures to reflect ECK transactions, and to provide new disclosures to existing customers if necessary. The Board anticipates that institutions will have depleted their existing stocks of initial disclosures by that time. Institutions are not required to provide new disclosures reflecting ECK transactions until the mandatory compliance date.

## Section 205.10 Preauthorized Transfers

## 10(b) Written Authorization for Preauthorized Transfers from Consumer's Account

Under § 205.10(b), preauthorized EFTs from a consumer's account may be authorized only by a writing signed or similarly authenticated by the consumer. Under existing comment 10(b)-3, a merchant or other payee could not obtain authorization by tape recording a telephone conversation with a consumer who agrees to recurring debits. Comment 10(b)-3 was adopted

prior to the enactment of the E-Sign Act. The final rule withdraws the interpretation in comment 10(b)-3 would be withdrawn in light of the E-Sign Act, as proposed.

The E-Sign Act provides, in general, that electronic records and electronic signatures satisfy legal requirements for traditional written records and signatures. Some have suggested that, given the E-Sign Act's broad definitions of "electronic record" and "electronic signature," a tape-recorded authorization, or certain types of tape-recorded authorizations, for preauthorized debits might be deemed to satisfy the Regulation E signed or similarly authenticated written authorization requirements. The Board proposed to withdraw the guidance regarding tape recordings because of E-Sign Act considerations, but did not propose to amend comment 10(b)-3 to address how the E-Sign Act should be interpreted with regard to tape recordings of telephone conversations.

Many commenters, including several financial institutions and financial trade associations, as well as a retailer trade association, supported the proposed withdrawal. These commenters stated that without the proposed change, consumers who do not have, or do not want to use, credit cards would not be able to use the telephone to purchase goods or services involving recurring debits to their deposit accounts. One commenter noted that many less affluent consumers do not own computers, so such consumers would be unable to electronically authorize recurring payments unless the proposal is adopted. Another commenter noted that if the proposal is not adopted, merchants may tend to use alternatives such as demand drafts, which offer less consumer protection than debit cards.

Other commenters, including financial institutions and financial trade associations, retailer trade associations, automated clearing house organizations, and a federal government agency, supported the proposal but with modifications or conditions. A few commenters recommended that merchants be permitted to obtain authorization for recurring debits by telephone, without recording, followed by written confirmation, if the consumer was given the option to cancel the transaction. Because of concerns about deceptive telemarketing, other commenters suggested that the use of telephone authorization be limited to situations where (1) the consumer and the merchant have a preexisting relationship, or (2) the consumer initiates the telephone call.

Several industry commenters urged the Board to remove uncertainty by explicitly stating that a recorded telephone conversation complies with the E-Sign Act and, therefore, Regulation E, to facilitate telephone authorizations of recurring debits. A few such commenters argued that merely withdrawing a portion of comment 10(b)-3 as proposed would cause further confusion and, absent additional guidance, would lead merchants to adopt differing practices. One commenter, a federal enforcement agency, recommended that the Board state affirmatively that if a payee relies upon the E-Sign Act in connection with obtaining the consumer's authorization, it must also fully comply with the E-Sign Act with respect to other provisions of the EFTA and Regulation E, including the requirement to provide a clear and conspicuous copy of the full authorization to the consumer. In contrast, a law firm representing retailers asserted that further clarifications regarding the E-Sign Act in the recurring debit context are unnecessary and may cause confusion in other instances when such clarifications are not provided.

A few industry commenters opposed the proposed withdrawal of the guidance due to the potential abuses and increased unauthorized transfers that could result.  One such commenter contended that tape recordings do not provide clear evidence of a consumer's authorization, which may be important in the event of a dispute.  This commenter also asserted that banks receive many complaints from consumers alleging that the consumer only authorized a one-time electronic debit, but that recurring debits are being processed.

The final rule withdraws the existing guidance regarding whether a tape recording may satisfy the requirement to obtain a consumer's written authorization for recurring debits as proposed.  The final rule does not interpret Regulation E to treat recorded telephone authorizations as written authorizations; however, the Board believes that the E-Sign Act's provisions regarding written documents are applicable to the EFTA and Regulation E.  As a result, if, under the E-Sign Act, a tape-recorded authorization, or certain types of tape-recorded authorizations, constitute a written and signed (or similarly authenticated) authorization, then the authorization would satisfy the Regulation E requirements.

In addition to complying with the E-Sign Act,[2] payees will need to ensure that they comply with the requirements of § 205.10(b) of Regulation E.  Specifically, the authorization must be readily identifiable as such to the consumer, and the terms of the preauthorized debits must be clear and readily understandable to the consumer.  See comment 10(b)-6.  Payees must also provide the consumer a copy of the authorization.  With respect to additional suggestions from commenters to permit authorization by telephone without recording but with written confirmation, or to limit the use of telephone authorizations to specific circumstances, such changes would require amendments to the EFTA or Regulation E rather than the staff commentary, and thus the Board has decided not to consider these suggestions at this time.

Comment 10(b)-7 addresses authorizations for recurring payments obtained by telephone or on-line, and states that the payee's failure to obtain written authorization is not a violation if the failure was not intentional and resulted from a bona fide error, notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.  For example, an error might occur where the consumer indicates that a credit card (for which no written authorization would be required) is being used for the authorization, when in fact the card is a debit card.

Concerns were expressed by retail and other industry groups about what procedures would be deemed reasonably adapted to avoid error where a telemarketer seeks to obtain a consumer's authorization for recurring payments for goods or services, such as newspaper subscriptions, using the consumer's credit or debit card.  The Board proposed to revise comment 10(b)-7 to state that procedures reasonably adapted to avoid error will vary with the circumstances.  The proposed revision also stated that asking the consumer to specify whether the card to be used for the authorization is a debit card or a credit card, using those terms, is a reasonable procedure.

The Board also proposed to add an example of a payee learning, after the transaction occurred, that the card used was a debit card as a result of the consumer bringing the matter to

---

[2] See, e.g., § 106(5) of the E-Sign Act (definition of "electronic signature").

the payee's attention.  For example, the consumer may call the merchant to assert a complaint about use of a debit card.

Most industry commenters supported the proposal as written, and a few suggested modifications.  No commenters opposed the proposal.  One trade association representing retailers suggested that comment 10(b)-7 not provide the example of asking the consumer whether the card being used is a debit card or a credit card as the safe harbor for compliance.  Another trade association requested that the comment not state that a reasonable procedure would require use of the term "debit card."  This commenter also recommended that the Board indicate in the comment that confirmation of the type of card being used is not necessary when the authorization is given in writing, including on-line.  In contrast to the comments from the retailer trade associations, a federal enforcement agency urged the Board to require payees to ask whether the consumer is using a debit or credit card, in lieu of creating a safe harbor for that procedure.  However, one law firm representing retailers opposed this suggestion contending that such a requirement would be unduly restrictive because merchants might have procedures that would not include asking whether the card is a debit or credit card.

The federal enforcement agency also suggested that the Board clarify that, in some cases, merchants should consider additional information as part of reasonable procedures to avoid error.  Such information might include, for example, repeated consumer complaints about unauthorized debits.  This commenter suggested that the commentary provide that if a merchant becomes aware of repeated authorization problems, it should examine and possibly change its procedures.  A law firm, however, argued that such a requirement would be unnecessary because merchants would have insufficient guidance as to what other information they should consider and under what circumstances.

One consumer group stated that the final rule should require that where the merchant learns only later, after the telephone authorization, that the card used was a debit card, the merchant must obtain a written and signed (or similarly authenticated) authorization or cease debiting the consumer's account.

The Board adopts the revisions to comment 10(b)-7 as proposed, with minor revisions.  As stated in the proposal, it may have been reasonable in the past, when relatively few debit cards were in use compared to credit cards, for payees to use procedures that did not involve asking questions about the type of card being used.  Today, however, given the growth of debit card usage, the Board believes that reasonable procedures should include interaction with the consumer specifically designed to elicit information about whether a debit card is involved.  Accordingly, the final rule retains the safe harbor example of a reasonable procedure of asking the consumer to specify whether the card to be used for the authorization is a debit (or check) card or a credit card.  The final comment includes a reference to "check cards" to reflect current terminology.  To illustrate the safe harbor, assume that a consumer makes a purchase which will result in a series of recurring payments.  After the merchant inquires about the payment method, the consumer indicates that they intend to use "Bank X" card, without stating whether the card is a debit card or a credit card.  In order to fall under the safe harbor, the merchant should then ask the consumer whether the card is a debit (or check) card or a credit card.

The final rule does not impose an express requirement of inquiring whether a card provided is a debit card or a credit card, because the determination of whether a procedure is reasonably adapted to avoid the error of failing to obtain a consumer's written authorization for recurring debits may vary with the circumstances. Similarly, although it may be reasonable in some cases for a merchant to revise their authorization procedures to avoid error based on additional information about potential authorization problems, such as repeated consumer complaints about unauthorized debits, the Board believes it is unnecessary to add a specific provision to the commentary that would require revised procedures in those limited instances.

The Board also does not believe that it is necessary to incorporate in the final rule a requirement that a merchant should promptly notify the consumer when it chooses to cease debiting the consumer's account upon learning that the card used was a debit card. The Board believes that a merchant, due to its own interest, will likely contact the consumer to arrange for some other means of payment.

A few industry commenters also addressed the Board's discussion in the proposal regarding whether merchants should be required to verify card numbers presented by consumers against lists of credit and debit card Bank Identification Numbers, commonly referred to as "BIN tables," as a reasonable procedure to avoid error. See In re Visa Check/Mastermoney Antitrust Litigation, No. CV-96-5238 (E.D.N.Y. 2003) (requiring Visa and MasterCard to make BIN tables available to merchants as part of a litigation settlement). These commenters agreed with the Board's observation that to the extent that BIN tables are not available to merchants in an on-line, real-time form, it would be burdensome for merchants to verify card numbers presented by consumers against the BIN tables. Moreover, the Board understands that Visa and MasterCard debit cards issued after January 1, 2005 display the word "debit" on the front of the card. Accordingly, the final rule does not require merchants to obtain or consult BIN tables to maintain procedures reasonably adapted to avoid error. Similarly, merchants are not required to check card numbers already on file against BIN tables.

**10(c) Consumer's Right to Stop Payment**

Proposed comment 10(c)-3 stated that an institution need not have the capability to block preauthorized debits, for example, where a preauthorized debit is made through a debit card system, and may instead use a third party to block the transfer(s), as long as such payments are in fact stopped. The proposal revised comment 10(c)-2 to cross-reference the new proposed comment. Comment 10(c)-2 is adopted as proposed, and comment 10(c)-3 is adopted with revisions for clarity.

In the proposal, comment 10(c)-3 was added to address procedures for stopping recurring debits where the account-holding institution is unable to block a payment from being posted to the consumer's account because, for example, the posting occurs soon after the transaction has been approved, such as where the transaction takes place over a debit card network. In these cases, the institution may not have sufficient time to identify payments against which stop-payment orders have been entered. The proposed comment provided an alternative procedure for how the account-holding institution can comply with the stop payment requirements of Regulation E in these circumstances.

Most commenters addressing this issue supported the proposal. One commenter observed that in the case of debit card transactions, the interception of transactions at the network level may be more effective than blocking transactions at the level of the account-holding institution. Some commenters requested clarification on various points. A few industry commenters asked that the Board clarify that comment 10(c)-3 does not apply to recurring debits processed through batch systems, such as the ACH network. Consumer groups were concerned that the proposal might imply that even if a consumer revokes authority for all future recurring debits by a payee, the financial institution may comply by stopping a single payment; these commenters believed that the obligation should be to cancel the debits permanently.

A number of commenters suggested that the Board adopt other revisions to the existing commentary under § 205.10(c). Several industry commenters asserted that the EFTA and Regulation E only require a financial institution to stop a single preauthorized debit, and do not require the institution to take action to respond to a consumer's revocation of authority for all future debits from a particular payee, as stated in comment 10(c)-2. The commenters suggested that the comment be removed or modified accordingly. In addition, some commenters suggested revising comment 10(c)-1 to state that a stop payment order need not be maintained by the consumer's financial institution for more than six months, maintaining that such a revision would make the comment consistent with Uniform Commercial Code (UCC) provisions relating to stop payment orders on checks and with industry practice.

Comment 10(c)-3 is adopted as proposed. The comment permits an institution, upon receiving a consumer's stop payment order, to use a third party to block a preauthorized transfer if the institution does not have the capability to block the preauthorized debit from being posted to the consumer's account, as long as the payment is in fact stopped, i.e., the consumer's account is not debited for the payment. Comment 10(c)-2 is also revised as proposed. The Board did not intend to imply that an institution's obligation to honor a stop-payment request is limited to a single preauthorized debit. If a consumer revokes authority for all further payments from a particular payee, the institution (through its own procedures or by using those of a third party, as provided in new comment 10(c)-3) must make arrangements such that no further debits originated by that payee are made to the consumer's account. However, the Board notes that under comment 10(c)-2, institutions may require the consumer to provide a copy of a written notice sent to the payee, revoking authority for the payee to originate debits to the consumer's account. If the consumer does not provide the copy within 14 days, the institution is not required to continue stopping payments to the payee.

As stated above, the proposal was intended to address problems in stopping recurring debits that take place over debit card networks, where the account-holding institution may not be able to timely block a debit from being posted to the consumer's account. Nevertheless, although comment 10(c)-3 primarily focuses on debits over debit card networks and other "real-time" systems, the comment is not limited to such systems and any institution that does not have the capability to block a preauthorized debit from being posted to the consumer's account may instead use a third party to block the debit, so long as the consumer's account is not debited for the payment.

**10(d) Notice of Transfers Varying in Amount**

When a preauthorized EFT from a consumer's account will vary in amount from the previous transfer, or from the preauthorized amount, § 205.10(d) requires the designated payee or the consumer's financial institution to send written notice of the amount and date of the transfer at least 10 days before the scheduled date of the transfer. Paragraph 10(d)(2) permits the payee or the institution to give the consumer the option of receiving notice only when a transfer falls outside a specified range of amounts or only when a transfer differs from the most recent transfer by more than an agreed-upon amount. Under the proposal, comment 10(d)(2)-2 would, in limited circumstances, relieve financial institutions of giving the consumer the option of receiving notice each time a transfer varies from the previous transfer. The final rule adopts proposed comment 10(d)(2)-2, with some revisions for consistency with the regulation.

Some financial institutions have suggested that while the notice requirement is appropriate where consumer funds are transferred to a third party, it should not apply when the transfer is between accounts, as defined under Regulation E, that are owned by the same consumer, even when the accounts are held at different financial institutions. These institutions assert that the advance notice requirement is particularly burdensome for institutions that offer certificate of deposit (CD) products that allow customers to set up preauthorized transfers of interest from the CD account to another account of the consumer held at a different institution. For such products, monthly interest payments might vary solely because of the different number of days in each month, yet such variance would require the institution to send the consumer advance notice in each instance before transferring the funds. The proposed comment would give financial institutions flexibility to provide notice only when a preauthorized transfer falls outside a specified range where funds are transferred and credited to an account of the consumer held at a different financial institution. (Preauthorized transfers between accounts of the same consumer held at the same institution qualify for the intra-institutional exclusion from coverage in § 205.3(c)(5).) Also, the proposal provided that the range must be an acceptable range that could be anticipated by the consumer, and the institution would have to notify the consumer of the range.

Commenters generally supported the proposed comment. Some industry commenters believed that the new comment could eliminate the need for unnecessary notices without detriment to consumers, while providing cost savings for those institutions that offer consumers the option of transferring funds to an account at another institution on a preauthorized basis. One industry commenter requested that the Board provide examples of acceptable ranges of balances and provide optional model language. Another industry commenter urged the Board to go further and exclude CD interest via ACH transfers from the scope of § 205.10(d) altogether, since CD accounts are not transaction accounts, and because transfers involve accrued interest only.

In contrast, one ACH trade association suggested that it may not be appropriate to allow institutions to avoid providing notices with each varying transfer without first obtaining consumer consent given that identity theft is an increasingly prevalent problem. This commenter noted that the NACHA rules already allow for ranges, and few companies take advantage of that opportunity. Consumer groups believed that the proposed commentary provision could facilitate transfers out of a consumer's account to repay payday loans, and urged the Board either to

withdraw the proposed commentary provision, or to strictly limit the exception to transfers of interest earned in one account to another account held in the same name.

The final rule adopts comment 10(d)(2)-2 as proposed, with minor revisions for clarity. Given the express language in Section 907(b) of the EFTA, it is not appropriate to remove the notice requirement entirely. Nevertheless, the Board believes that requiring a notice for each varying transfer where the transfer is between accounts owned by the same consumer provides little benefit to the consumer while imposing unnecessary costs on the financial institution making the transfer. Because this exception is limited to transfers of consumer funds between accounts held by the same consumer at different institutions, the Board believes the risk of loss from identity theft is minimal. In addition, because the transfers must be between consumer accounts held at different financial institutions, the exception would not be applicable to transfers to repay loans, including payday loans, which are not accounts under Regulation E. The Board is not aware of any other circumstances that pose additional risks to a consumer's account if this comment is adopted, and thus believes it is unnecessary to limit the exception to accounts solely involving transfers of CD interest.

For consistency with § 205.10(d)(2), the final comment is revised to provide that a financial institution may elect to provide notice only when a preauthorized transfer falls outside a specified range, or differs from a specified amount from the most recent transfer, without providing the consumer the option of receiving notice of all varying transfers, if the funds are transferred and credited to an account of the consumer held at another financial institution. The range or amount of variance must be reasonably anticipated by the consumer, and the institution must notify the consumer of the range or amount at the time the institution obtains the consumer's authorization for the preauthorized transfers. Comment 10(d)(2)-2 includes an example of an acceptable range where the preauthorized transfers are for transfers of interest for a fixed-rate CD account. In this case, an institution could provide a range based on transfers of interest for months containing 28 days and for months containing 31 days.

## Section 205.11 Procedures for Resolving Errors

## 11(b) Notice of Error from Consumer

The Board proposed to clarify in comment 11(b)-7 that an institution need not comply with the procedures and time limits in § 205.11 for investigating a consumer's assertion of an error when the consumer provides a notice of error after the time period specified in § 205.11(b). Where the error involves an unauthorized EFT, however, liability for the unauthorized transfer may not be imposed on the consumer unless the institution satisfies the requirements of § 205.6. Comment 11(b)-7 is adopted generally as proposed, with some revisions to address commenters' concerns.

Commenters on the issue uniformly supported the proposed comment, although some industry commenters asked the Board to provide certain additional clarifications. A few commenters believed that it was unclear which provisions of § 205.6 were applicable where the asserted error involves an unauthorized transaction. For example, one commenter stated that the generic reference to § 205.6 is confusing in light of the limitation on liability in § 205.6(b)(1)

when the consumer provides timely notice.  The final rule retains the general reference because the requirements for the consumer to provide timely notice is different under § 205.6 than under § 205.11.  Under § 205.11, the consumer must provide notice 60 days after the financial institution sends the periodic statement on which the alleged error is reflected.  In contrast, under § 205.6, the consumer must provide notice two business days after learning of the loss or theft of an access device.  Moreover, the consequences to the consumer for failing to provide timely notice differ under §§ 205.6 and 205.11.  For example, a consumer may not find out about the loss or theft of an access device until more than 60 days after a periodic statement is sent.[3]  In such case, the consumer's liability could still be capped at $50 or less as provided under § 205.6(b)(1), so long as the consumer notifies his or her financial institution within two business days after learning of the loss or theft of the access device, notwithstanding the fact that the procedures and time frames in § 205.11 would not apply.

Industry commenters also suggested that the Board conform the 60-day time frame for providing notices of error in § 205.11 to time frames provided under other laws or payment system rules.  Several commenters urged the Board to conform the time frame for reporting an error in § 205.11(b)(1) from 60 days after the date of availability of the periodic statement to 60 days after the settlement date of the transaction consistent with the NACHA rules.  The 60-day time frame for providing a notice of error in connection with an EFT after a periodic statement is sent, however, is a statutory requirement under Section 908(a) of the EFTA.  Some commenters believed that the Board should adopt a time limitation for asserting a claim of an unauthorized EFT of one year from the date of availability of the periodic statement, consistent with time frames established by Check 21 and § 4-408 of the UCC.  The EFTA does not contain a time limitation for asserting a claim of unauthorized EFTs, and the Board did not propose such a limitation.  Accordingly, the Board declines to adopt the suggested changes.

Finally, one banking trade association recommended that the Board recognize the exception in § 205.6(b)(4) for extending the time frames for reporting an unauthorized transaction if the consumer's delay in notification is due to extenuating circumstances.  The Board agrees that where a consumer is unable to provide timely notice for an unauthorized EFT due to extenuating circumstances, such as extended travel or a hospitalization, an institution must extend the time frames provided in § 205.6(b) for reporting the unauthorized transaction.

## 11(c) Time Limits and Extent of Investigation

Section 205.11(c)(4) permits an institution to limit the investigation of an alleged error to "a review of its own records" where the allegation pertains to a transfer to or from a third party with whom the institution has no agreement for the type of EFT involved.  This is commonly referred to as the "four walls" rule.  Comment 11(c)(4)-4 provides that a financial institution does not have an agreement with a third party solely because it participates in transactions that occur under the federal recurring payments programs, or that are cleared through an ACH or similar arrangement for the clearing and settlement of fund transfers generally, or because it agrees to be bound by the rules of such an arrangement.  Proposed comment 11(c)(4)-5 provided that an institution's "own records" may not be limited to the payment instructions where

---

[3]  Comment 6(b)(1)-2 states that the fact that a consumer has received a periodic statement that reflects unauthorized transfers cannot be deemed to represent conclusive evidence that the consumer had such knowledge.

additional information is available within the institution relevant to resolving the consumer's particular claim. As explained in the supplementary information to the proposal, because the number and variety of ACH payments has expanded significantly since the "four walls" rule was first adopted in 1980, an institution's review of additional information beyond the payment instructions may be necessary to provide consumers with a meaningful investigation of an allegedly erroneous or unauthorized payment. Comment 11(c)(4)-5 is adopted as proposed, with some modifications to address commenter concerns.

Some commenters favored the proposed comment, including consumer groups, a federal enforcement agency, and a few industry commenters. These commenters generally agreed with the Board's stated rationale for the proposed comment. For example, several credit union commenters stated that it is reasonable to expect financial institutions to exhaust their review of internal records when responding to alleged errors regarding consumers' Regulation E transactions. Consumer groups urged the Board to revise the comment to state that an institution's reviews should consider records that could be helpful to resolving a consumer's claim(s), not just those records that are dispositive. One industry commenter generally agreed with the proposal in light of both the increased variety of EFT transaction types and its belief that information relevant to an assertion of error could likely to be outside the payment instructions but within the institution's "four walls" and records.

Most industry commenters opposed the proposed comment. Many industry commenters raised concerns about ambiguity as to the scope of the required investigation, the potential burden on institutions, and the low likelihood of yielding additional, helpful information. Several commenters asserted that it would unnecessarily require institutions to look beyond their own records and could potentially require that they seek to obtain information from additional parties to the transaction when payment instructions could resolve the claim of error.

Many industry commenters were also concerned that the proposed comment might require that an institution look for any and all potentially relevant records – even in cases where a consumer may have many different relationships with the institution (deposit, credit, investment). One commenter stated that it would be impractical for a large bank to comply with the proposed comment, since it would require a review of information relating to other accounts and transactions stored in various locations. Similarly, a few commenters noted that a bank employee conducting an investigation might not be aware of all of these relationships or may lack a practical ability to obtain all information about the bank's dealings with that customer. These commenters argued that a reasonable interpretation of the "four walls" rule must limit the bank's duty to inquire not just about information within the institution's own records relevant to resolving the consumer's particular claim, but to information that is reasonably available to the bank employee investigating the consumer's claim.

Several ACH associations asserted that the proposal could further confuse what is already a troublesome section of the Commentary for their members. These and other commenters generally believed that institutions would be unlikely to have readily available information in their records beyond the payment instructions that would assist in the review of the particular transaction, noting, for example, that the consumer's authorization for the transaction would be in the possession of the originator-payee, not the consumer's institution. These commenters

stated that searching for, and obtaining, such additional information would be time-consuming and costly. They added that since authorization is between the consumer and the originator of the transaction, the proposed comment could inappropriately place the consumer's institution in the position of deciding the legitimacy of the authorization. In their view, this issue should be resolved between the merchant or other payee and the consumer – not by the consumer's financial institution.

Many industry commenters, including ACH associations, noted that the NACHA rules already ensure a remedy under which the consumer is already made whole in a timely manner.[4] One industry commenter, however, argued that the NACHA rules were insufficient because of the shorter time period for reversing transactions (chargebacks), urging instead that the Board withdraw the proposed comment and encourage NACHA to amend its rules to conform its chargeback period to the period set forth under § 205.11 for reporting alleged errors.[5] This commenter asserted that this change would properly place the burden of assuring proper authorization of transactions on the originating merchant and financial institution – the two parties best positioned to monitor and ensure compliance with this requirement. This commenter maintained that the automatic right to charge back under the NACHA rules works well for most ACH disputes and that extending the time period for permitting charge backs would not impose significant additional costs on merchants or its financial institution.

Many industry commenters recommended that the regulation require a "reasonable" investigation and to provide examples of appropriate steps to be taken to minimize the compliance burden similar to existing guidance under Regulation Z. See, e.g., § 226.12(b)-3. In their view, a reasonable investigation might, for example, consist of an examination of the institution's records for the account in question, but not all accounts held by the particular consumer at the financial institution. These commenters believed that a "reasonable investigation" standard would enable institutions to take measures appropriate to the nature of the error and the size of the institution.

A few commenters, including consumer groups, asked the Board to clarify an institution's error resolution responsibilities under the "four walls" rule when it has outsourced relevant aspects of its operations, such as payment processing or the investigation of disputes. These commenters believe that in such cases an institution's records should include a review of information that is within the institution's possession or control and not merely within the institution's physical offices. Another commenter inquired how the proposed error resolution process would work where an EFT service provider (rather than an account holding institution) is providing the EFT service. This commenter asserted that currently, account holding institutions have limited error-resolution obligations with respect to errors resulting from a third-party service provider, and that the proposed commentary language should clarify whether there is any

---

[4] Under the NACHA rules, if the consumer executes a written statement under penalty of perjury within the prescribed time frame of 60 days from the date of the transaction, the financial institution will promptly re-credit the consumer's account and return the transaction to the payee.

[5] Section 205.11(b) of Regulation E generally requires a financial institution to investigate a claim of error that is received no later than 60 days after the institution sends the periodic statement on which the alleged error is first reflected.

intended change in the error resolution responsibilities between the service provider and account holding institution.

As stated in the proposal, the "four walls" rule was adopted when most third party transfers involved preauthorized credits to a consumer's account to pay salary or other compensation, or preauthorized debits from a consumer's account to pay a utility company or other payee. In the absence of an agreement between the financial institution and the third party, it was deemed reasonable to permit an institution to limit its investigation to the institution's own records. See 45 FR 8,248 (Feb. 6, 1980). Historically, alleged errors often pertained to the amount of the transfer. Consequently, an institution would likely have very limited information–such as the ACH payment instructions–for purposes of conducting its investigation. The "four walls" approach thus sought to strike a balance between an institution's investigatory burden relative to the types of errors commonly asserted and the institution's practical ability to procure relevant information in light of its lack of an agreement with the third party.

In the twenty-five years since the "four walls" analysis was adopted, the increasing use of ACH as a means to effectuate a wide variety of third-party transfers (and preauthorized transfers) has expanded significantly, and, as a result, the types of errors that may occur is far greater than those originally contemplated. For example, the ACH network today is used to process ECK transactions. Similarly, a merchant may use the ACH network in an on-line or telephone transaction to initiate an EFT from a consumer's account using the consumer's checking account number. In these cases, consumers may encounter errors concerning authorizations and the types of transfers, in addition to errors regarding the amounts of the resulting ACH debits. The risk that a consumer's check or checking account number could be used in a fraudulent manner to make an ACH transfer from the consumer's account was not a concern when the "four walls" analysis was adopted, since the typical ACH transfer then involved a preauthorized transfer to or from a known party.

Today, when a consumer believes that a transaction is unauthorized, information such as the location of the payee, the particular number of the check (to determine if it is notably out of order), or prior consumer account transactions with the same payee, that could be relevant to the investigation would more likely be within the institution's own records. Thus, for ACH and ECK transactions, for example, the Board believes that an institution's review of its "own records" should not be confined to a mere confirmation of the payment instructions when other information within the institution's "four walls" could also be reviewed.

Any investigation conducted under the four walls rule must be reasonable. Because the nature of a consumer's allegation of error can vary, the scope of an investigation may vary. In each case, an institution should use relevant information available within its own records for purposes of determining whether an error occurred. Given the potential size and complexity of institutions and their many different relationships with a single consumer, however, it may be impractical and burdensome for an institution to look throughout its entire operation for potentially relevant records. The final rule clarifies that the information reviewed should pertain to the account for which the assertion of error is made and cover a reasonable period of time. The revised comment also provides examples of information that an institution might review. These examples are not set forth as an exclusive list.

Institutions have flexibility to determine what information is relevant to a meaningful investigation of the error in question. To the extent that an account-holding institution has outsourced relevant aspects of its operations, the investigation should include a review of service provider records if such records could help to resolve the consumer's claim. Under the "four walls" rule, the institution need not, however, include a review of records that are not within its possession or control – such as the consumer's authorization for the transaction if such authorization is in the possession of a third-party payee. Additional requirements may be established by payment system or other rules, however.

The proposal also solicited comment as to whether there are circumstances in which the "four walls" rule should not apply. Industry commenters generally stated that they were unaware of such circumstances at this time, and that there is typically no need to require banks to conduct investigations outside of their own records. The Board will continue to monitor institutions' error resolution practices to assess the continued viability of the "four walls" approach to error investigation.

## Section 205.16 Disclosures at Automated Teller Machines

Section 205.16 requires an ATM operator that imposes a fee on a consumer for initiating an EFT or a balance inquiry to provide notice to the consumer that a fee will be imposed for providing the EFT service or for a balance inquiry and to disclose the amount of the fee. An ATM operator is any person who operates an ATM at which consumers initiate an EFT or a balance inquiry, and that does not hold the account to or from which the transfer is made, or about which an inquiry is made. Notice of the imposition of the fee must be provided in a prominent and conspicuous location on or at the ATM. The operator must also provide notice that the fee will be charged and the amount of the fee either on the screen of the ATM or by providing it on paper, before the consumer is committed to paying a fee.

In the September 2004 proposal, the Board proposed to revise comment 205.16(b)(1)-1 to clarify that ATM operators can disclose on the ATM signage that a fee may be imposed or specify the type of EFTs or consumers for which a fee is imposed, if there are circumstances in which an ATM surcharge will not be charged for a particular transaction. (69 FR at 56,005.) After consideration of the comments received, the Board withdrew the proposed commentary revisions and instead proposed to amend § 205.16(b) to clarify that ATM operators may disclose on ATM signage that a fee will be imposed or, in the alternative, that a fee may be imposed on consumers initiating an EFT or for a balance inquiry if there are circumstances under which some consumers would not be charged for such services. (70 FR 49,891 (Aug. 25, 2005).) The proposed commentary was revised to clarify that ATM operators that impose an ATM surcharge in all cases must provide notice on the ATM signage that a fee will be imposed. The revisions are adopted largely as proposed, with certain revisions for clarity.

Several large institutions have asked whether it is permissible under § 205.16 to provide notice on the ATM that a fee "may be" charged for providing EFT services because many ATM operators, particularly those owned or operated by banks, apply ATM surcharges to some categories of their ATM users, but not others. For example, an ATM operator might not charge a

fee to holders of cards issued by foreign financial institutions, cardholders of banks that are part of a surcharge-free network or that have entered into a contractual relationship with the ATM operator with respect to surcharges, and holders of cards issued under governmental electronic benefit transfer (EBT) programs.  (While many financial institutions do not impose ATM surcharges on their own cardholders, they are not ATM operators with respect to those cardholders for purposes of § 205.16 because the institutions hold the cardholders' accounts.)  More recently, many banks voluntarily waived surcharges for consumers from areas affected by Hurricane Katrina.  Also, an ATM operator might charge a fee for cash withdrawals, but not for balance inquiries.  Accordingly, the Board recognized in its two proposals that a disclosure on the ATM that a fee "will" be imposed in all instances could be overly broad with respect to consumers who would not be assessed a fee for usage of the ATM.

Industry commenters strongly supported the August 2005 proposal, stating that it would give ATM operators the flexibility to more accurately disclose their surcharging practices, and thereby reduce consumer confusion.  Several industry commenters asserted that a "will" disclosure could cause consumers who would not be charged a fee by the particular ATM to go to a different ATM, which could inconvenience the consumer, as well as possibly result in a fee surcharge at the second ATM that could have been avoided with a more accurate disclosure.  Another industry commenter noted that most consumers will be unaware that the ATM signage disclosure is only required for consumers who do not hold accounts with the ATM operator, and that the use of "may" could easily be understood by ATM users as accommodating the ATM operator's cardholders.

Industry commenters also agreed with the Board's observation in the August 2005 proposal's supplementary information that the signage disclosure is intended to allow consumers to identify ATMs that generally charge a fee for use, while the on-screen disclosure made after the consumer has entered his or her card into the machine but before the consumer is committed to the transaction provides a more specific disclosure regarding whether a fee will be incurred in that particular transaction.  To support their view that the proposal is consistent with Sections 904(d)(3)(A) and (B) of the EFTA, industry commenters cited a press release issued by the original act's sponsor, Rep. Marge Roukema, which stated that the act "simply puts existing practice into law."[6]  One banking trade association noted that prior to the enactment of the Gramm-Leach-Bliley Act, the operating rules for one of the country's largest ATM networks required ATM operators imposing a surcharge for use of their ATMs to post conspicuous notice on the ATM that the operator "may" charge a fee for cash withdrawals.  The trade association further noted that this practice of disclosing that a fee "may" be imposed on signage followed by a more transaction-specific on-screen disclosure was, and continues to be, the common practice of some of the other larger ATM networks in the United States.

Several industry commenters specifically addressed the Board's decision to amend the regulation in the August 2005 proposal, instead of revising the commentary as originally proposed.  One banking trade association stated that amending both the regulation and the commentary would facilitate industry understanding and compliance.  Two other commenters,

---

[6]  Banking Committee OKs Roukema ATM Fee Disclosure (March 10, 1999), http://financialservices.house.gov/banking/31099rou.htm.

representing credit unions, observed that the proposal to amend only the commentary was arguably inconsistent with § 205.16's current language, and therefore the Board's new proposal was appropriate. A few industry commenters asked the Board to clarify that the revisions do not represent a change in the ATM disclosure scheme, but merely a restatement and clarification of the requirements of existing law.

Although agreeing that the EFTA permits signage at the ATM machine indicating that the fee is not charged in every instance, consumer groups believed that the revised proposal did not sufficiently implement the statute because it did not ensure that consumers who "will" be charged a fee would be adequately notified of that fact. Consumer groups believed that the circumstances in which fees will not be charged generally are limited. Therefore, consumer groups proposed an alternative approach that would require ATM operators to generally disclose that a fee "will" be imposed along with a list of exceptions when a fee would not be imposed. Consumer groups believed that the revised disclosure would more adequately apprise consumers of the fact that a fee will be imposed while still allowing ATM operators the flexibility to make more accurate disclosures regarding their surcharging practices.

Industry commenters, however, noted that a rule requiring a "will" disclosure along with a list of the circumstances under which a fee would not be disclosed would likely result in lengthy and complicated signs that consumers are unlikely to read. Moreover, industry commenters also believed that the expense of replacing signs each time a surcharge policy is changed could have the unintended effect of discouraging ATM operators from waiving fees to accommodate consumers in special circumstances, such as in response to a natural disaster.

A consumer rights attorney who opposed the Board's September 2004 proposal on this issue reiterated his view that the current rule and commentary more correctly implements the statute's intent, and cited his prior comments. This attorney urged the Board to withdraw the current proposal.

The August 2005 revisions are adopted as proposed under the Board's authority under Section 904(d) of the EFTA. Amending both the rule and the commentary addresses any potential inconsistencies between the current language of § 205.16 and the earlier proposed commentary, thereby facilitating industry compliance. However, while the Board is amending the regulation to address this issue, this amendment does not represent a change in the Board's interpretation of the rule's requirements.

The final rule clarifies the two-part disclosure scheme established in Section 904(d)(3)(B) of the EFTA. The first disclosure, on ATM signage posted on or at the ATM, allows consumers to identify quickly ATMs that generally charge a fee for use. This disclosure is not intended to provide a complete disclosure of the fees associated with the particular type of transaction the consumer seeks to conduct. Until a consumer uses his or her card at an ATM, the ATM operator does not know whether a surcharge will be imposed for that particular consumer. Rather, it is the second, more specific disclosure, made either on the ATM screen or on an ATM receipt, that informs the consumer before he or she is committed to the transaction whether, in fact, a fee will be imposed for the transaction and the amount of the fee. Thus, consumers who are charged a fee would not be adversely affected by a general notice that a fee "may" be imposed because

they will have the opportunity to terminate the transaction after receiving the on-screen notice or receipt containing the transaction-specific disclosure.

The Board further believes that an alternative rule requiring institutions to provide a general disclosure that a fee "will" be imposed, while also specifying the circumstances under which a fee will not be imposed, would impose significant costs on ATM operators without corresponding benefit to consumers.  Commenters indicated at least ten different circumstances in which a waiver may apply for a given ATM transaction, including surcharge-free networks, other contractual relationships, cards issued by foreign financial institutions, cards delivering governmental benefits, corporate affiliations with the ATM operator, and in response to special circumstances, such as to provide disaster relief.  Thus, consumers could be confused or discouraged by signage containing potentially lengthy disclosures listing the many circumstances under which a fee would not be imposed.  Such a rule could also require ATM operators to modify all of their signs each time they revised their surcharge practices, at considerable cost. Industry commenters estimated the cost of a systemwide change in ATM signage anywhere between $200,000 for an institution with approximately 6,000 ATMs to over $1 million for an institution with over 16,500 ATMs.  Moreover, the time necessary for changing all of the signs would render at least some of the signs inaccurate for a period of time.

Accordingly, for the reasons discussed above, § 205.16(b) is revised to explicitly clarify that ATM operators may disclose on ATM signage that a fee will be imposed or, in the alternative, that a fee may be imposed on consumers initiating an EFT or for a balance inquiry if there are circumstances under which some consumers would not be charged for such services. The flexibility provided in the final rule allows ATM operators that currently disclose that a fee "will" be charged to continue to use existing signs even if a fee is not charged in all cases. Comment 16(b)(1)-1 is revised for consistency with the final rule, and to clarify that ATM operators that impose an ATM surcharge in all cases must provide notice on the ATM signage that a fee "will" be charged.

## Appendix A – Model Disclosure Clauses and Forms

## A-2 – Model Clauses for Initial Disclosures

Model clauses for initial disclosures contained in Appendix A (Form A-2) are revised to provide disclosures about ECK transactions.  In particular, model clauses (a) and (b) are revised to instruct consumers to notify their account holding institution when unauthorized EFTs have been made without the consumer's permission using information from their checks.  The discussion on the applicable liability limits remains generally unchanged, however, because the first two tiers of liability do not apply to unauthorized transfers made without an access device (for example, those made using information from a check to initiate a one-time ACH debit).  See comments 2(a)-2, 6(b)(3)-2.

Model clause (d) also is revised to list as a new type of transfer a one-time electronic fund transfer made from a consumer account using information from the consumer's check.  See comment 7(b)(4)-4.

## A-3 – Model Forms for Error-Resolution Notice

Paragraph (b) of Model Form A-3 is included after its inadvertent deletion following publication of the March 2001 interim final rule establishing uniform standards for the electronic delivery of disclosures required by the EFTA and Regulation E. 66 FR 17,786 (April 4, 2001). No changes are intended by the re-inclusion of paragraph (b). Paragraph (a) is reprinted for convenience.

## A-6 – Model Clauses for Authorizing One-Time Electronic Fund Transfer Using Information From a Check (§ 205.3(b)(2))

Model Form A-6 is added to provide model clauses for the authorization requirements of § 205.3(b)(2) for a person that initiates an EFT using information from a consumer's check. Consistent with comment 2 for Appendix A, the use of appropriate clauses in making disclosures will provide protection from liability under Sections 915 and 916 of the EFTA provided the clauses accurately reflect the institution's EFT services. See also § 205.3(b)(2)(iv). Model Clause A-6(a), which permits payees to obtain a consumer's authorization to use information from his or her check to initiate an EFT or to process the transaction as a check, is adopted generally as proposed. Model Clause A-6(a) may be used in all instances. Model Clause A-6(b) is also adopted to accommodate those payees who may want to provide more specific information concerning their ECK practices for business reasons, and consolidates proposed Model Clauses A-6(b) and (c). The additional information about when funds may be debited from the consumer's account and the non-return of checks is provided in Model Clause A-6(c) of the final rule.

## V. Final Regulatory Flexibility Analysis

The Board prepared an initial regulatory flexibility analysis as required by the Regulatory Flexibility Act (RFA) (5 U.S.C. 601 et seq.) in connection with the September 2004 proposal. The Board received no comments on its initial regulatory flexibility analysis.

Under Section 605(b) of the RFA, 5 U.S.C. 605(b), the regulatory flexibility analysis otherwise required under Section 604 of the RFA is not required if an agency certifies, along with a statement providing the factual basis for such certification, that the rule will not have a significant economic impact on a substantial number of small entities. Based on its analysis and for the reasons stated below, the Board certifies that this final rule will not have a significant economic impact on a substantial number of small entities.

1. Statement of the need for, and objectives of, the final rule. The Board is revising Regulation E to require a person initiating an EFT using information from a consumer's check to obtain the consumer's authorization. Generally, authorization is obtained when the payee provides notice that a payment by check will or may be converted to an EFT, and the consumer provides a check as payment. The amendment to Regulation E will promote consistency in the notice provided to consumers by merchants and other payees.

Additional guidance is provided in the staff commentary about a financial institution's error resolution obligations for certain transactions, and to clarify the responsibilities of financial institutions and merchants for preauthorized transfers from consumer accounts.

The EFTA was enacted to provide a basic framework establishing the rights, liabilities, and responsibilities of participants in EFT systems. The primary objective of the EFTA is the provision of individual consumer rights. 15 U.S.C. 1693. The EFTA authorizes the Board to prescribe regulations to carry out the purpose and provisions of the statute. 15 U.S.C. 1693b(a). The EFTA expressly states that the Board's regulations may contain "such classifications, differentiations, or other provisions, . . . as, in the judgment of the Board, are necessary or proper to effectuate the purposes of [the EFTA], to prevent circumvention or evasion [of the act], or to facilitate compliance [with the EFTA]." 15 U.S.C. 1693b(c). The EFTA also states that "[i]f electronic fund transfer services are made available to consumers by a person other than a financial institution holding a consumer's account, the Board shall by regulation assure that the disclosures, protections, responsibilities, and remedies created by [the EFTA] are made applicable to such persons and services." 15 U.S.C. 1693b(d). The Board believes that the revisions to Regulation E discussed above are within Congress' broad grant of authority to the Board to adopt provisions that carry out the purposes of the statute.

2. <u>Issues raised by comments in response to the initial regulatory flexibility analysis</u>. In accordance with Section 3(a) of the RFA, the Board conducted an initial regulatory flexibility analysis in connection with the proposed rule. The Board did not receive any comments on its initial regulatory flexibility analysis.

3. <u>Small entities affected by the final rule</u>. Merchants or other payees that initiate one-time EFTs from a consumer's account using information from the consumer's check are required under the regulation to obtain the consumer's authorization for the transfers. For POS and ARC transactions, payees must provide a notice that a check will or may be converted. For ARC transactions, notice will likely be provided on a billing statement or invoice. At POS, notice also must be provided on posted signage, and a copy of the notice must be given to the consumer at the time of the transaction. Payees in ECK transactions must also provide notice that funds may be debited from a consumer's account as soon as the same day payment is made or received and that the consumer's check will not be returned by the consumer's financial institution. In addition, before a payee may collect a service fee for insufficient or uncollected funds via EFT from a consumer's account, the payee must provide a notice that such a fee may be collected by use of an EFT and disclose the amount of the fee. Account-holding institutions are required under the regulation to disclose to their consumers that electronic check conversion transactions are a new type of transfer that can be made from a consumer's account.

Merchants and other payees that engage in check conversion transactions must obtain consumers' authorizations for electronic check conversion transactions and for the collection of fees debited via an EFT if a payment is returned unpaid, and generally do so via signage and on a transaction receipt at the POS. In particular, payment system rules require that authorization for one-time debits to a consumer's account must be in writing and signed or similarly authenticated by the consumer. The Board further understands that many payees provide notice on receipts at

POS.   Similarly, payees are generally providing written notices in ARC transactions because payment system rules require written notices to be provided to consumers.

Under the amendments to Regulation E, payees must review the notices that they presently provide in accordance with payment system rules, and may be required to revise these notices in some cases to ensure compliance with the amendments to Regulation E.  The Board believes that these amendments will not have a significant economic impact on small entities because payees are generally providing notices regarding ECK and the collection of service fees for insufficient funds electronically in accordance with payment system rules.  Furthermore, the Board believes that obtaining consumer authorization for ECK transactions via signage at the POS is less costly than obtaining authorization via signed receipts.

Payees will have to revise their notices to inform consumers in ECK transactions that funds may be debited from their account soon after payment is received and, if applicable, that consumers' checks will not be returned by their financial institutions.  At POS, this additional information may be provided separately from the general authorization notice.  The Board understands that many payees in ARC transactions are already providing notice to consumers regarding when funds may be debited from a consumer's account when consumers' checks are converted, and stating that consumers' checks will not be returned by their financial institutions.  For those payees that are not already providing some form of notice at POS or for ARC transactions, the final rule provides model language to facilitate compliance.  Thus, the Board does not believe that the requirement to provide notice about the nature of ECK transactions will have a significant economic impact on small entities.

Small financial institutions may need to review their initial disclosures, and perhaps revise them to reflect that electronic check conversion transactions are a new type of transfer that can be made from a consumer's account.  This disclosure is also "generic" and will not vary among consumers.  Model language is provided in the rule to facilitate compliance.  Thus, the Board believes this requirement also should not have a significant economic impact on small entities.  The Board also understands that many institutions have already revised their periodic statements to reflect that checks may be converted.

    4.  <u>Other federal rules</u>.  The Board believes no federal rules duplicate, overlap, or conflict with the final revisions to Regulation E.

    5.  <u>Significant alternatives to the proposed revisions</u>.  The Board solicited comment about potential ways to reduce regulatory burden.  Several commenters urged the Board not to require written, signed authorization for checks converted at POS.  In light of the potential impact on entities and limited additional consumer benefit, the final rule does not require a payee to obtain a consumer's signature to convert a check.  In the final rule, the Board is also providing a sunset period of three years for the additional ECK disclosures about when funds may be debited from the consumer's account and the non-return of checks.  The Board anticipates that increased consumer familiarity with ECK transactions over time will make unnecessary the provision of this additional information.

**VI.  Paperwork Reduction Act**

In accordance with the Paperwork Reduction Act (PRA) of 1995 (44 U.S.C. 3506; 5 CFR 1320 Appendix A.1), the Board reviewed the rule under the authority delegated to the Board by the Office of Management and Budget (OMB). The final rule contains requirements subject to the PRA. The collection of information that is required by this rule is found in 12 CFR 205.2(b)(3), 205.3(b)(2) and 205.7. The Federal Reserve may not conduct or sponsor, and an organization is not required to respond to, this information collection unless the information collection displays a currently valid OMB control number. The OMB control number is 7100-0200. This information is required to provide benefits for consumers and is mandatory (15 U.S.C. 1693 et seq.). The respondents/recordkeepers are for-profit financial institutions, including small businesses. Institutions are required to retain records for 24 months.

All financial institutions subject to Regulation E, of which there are approximately 19,300, are considered respondents for the purposes of the PRA and may be required to provide notice to accountholders that electronic check conversion (ECK) transactions are a new type of transfer that may be made from a consumer's account under § 205.7. In addition, all persons, such as merchants and other payees, that engage in ECK transactions, of which there are approximately 80,000, potentially are affected by this collection of information, because these merchants and payees will be required to obtain a consumer's authorization for the electronic transfer under § 205.3(b)(2).

The following estimates represent an average across all respondents and reflect variations among institutions based on their size, complexity, and practices. The other federal agencies are responsible for estimating and reporting to OMB the total paperwork burden for the institutions for which they have administrative enforcement authority. They may, but are not required to, use the Federal Reserve's burden estimate methodology.

The first disclosure requirement, described in § 205.7, is the initial disclosure that a financial institution must provide to their accountholders reflecting that ECK transactions are a new type of transfer that can be made from a consumer's account. The Federal Reserve estimates that each of the institutions, for which it has administrative enforcement authority (collectively referred to in the following paragraphs as "respondents regulated by the Federal Reserve") will be required to provide a revised initial disclosure to their accountholders. Currently, all respondents regulated by the Federal Reserve are required to provide a disclosure of basic terms, costs, and rights relating to EFT services under Regulation E. For purposes of this PRA analysis, the Federal Reserve estimates that it will take financial institutions, on average, 8 hours (one business day) to reprogram and update systems to include the new notice requirement relating to ECK transactions; therefore, the Federal Reserve estimates that the total annual burden for all financial institutions for this requirement will be 154,400 hours. With respect to the 1,289 Federal-Reserve-regulated institutions which must comply with Regulation E, it is estimated that the total annual burden for this requirement will be 10,312 hours. The final revisions to Regulation E provide institutions with model clauses for the initial disclosure requirement for ECK transactions (provided in Appendix A) that they may use to comply with the notice requirement.

The second disclosure requirement, described in § 205.3(b)(2), is required when persons, such as merchants and other payees, engage in ECK transactions. Under the final rule, merchants and payees are generally required to provide written notice to obtain a consumer's authorization for the one-time EFT. Merchants and payees will also be required to provide a written notice to obtain a consumer's authorization to collect any service fees for insufficient or uncollected funds via an EFT to the consumer's account. The notice must also disclose the amount of the service fee. Finally, merchants and payees that engage in ECK transactions must provide a notice to consumers that when a check is used to initiate an EFT, funds may be debited from a consumer's account as soon as the same day payment is made or received and consumers' checks will not be returned by their financial institution.

The Federal Reserve estimates that of the 1,289 respondents regulated by the Federal Reserve that are required to comply with Regulation E, approximately 10 originate ECK transactions. The Federal Reserve estimates that it will take each respondent, on average, 8 hours (1 business day) to reprogram and update their systems to include the new notice requirement relating to ECK transactions; therefore, the Federal Reserve estimates that the total annual burden is 80 hours. The final revisions to Regulation E provide institutions with model clauses (provided in Appendix A) for the new disclosure requirements. Using the Federal Reserve's methodology, the total annual burden for all other merchants and payees engaging in ECK transactions is 639,920 hours.

A third disclosure requirement applies to ATM operators who are required to provide notice to consumers of an ATM surcharge. Under this final rule, ATM operators will be permitted to disclose on signage posted at the ATM that a surcharge "may" be imposed if there are circumstances under which a surcharge is not imposed. All financial institutions, of which there are approximately 19,300, potentially are subject to this requirement to the extent they are ATM operators under the rule. The extent to which this collection of information affects a particular financial institution depends on the number of ATMs an institution operates, and on whether the institution elects to revise its ATM signage disclosures. For purposes of this PRA analysis, the Federal Reserve estimates that it will take financial institutions, on average, 8 hours (one business day) to revise and update ATM signage; therefore the Federal Reserve estimates that the total annual burden for all depository institutions for this requirement is 154,400 hours. With respect to the 1,289 Federal Reserve-regulated institutions which must comply with Regulation E, it is estimated that the total annual burden for this requirement will be 10,312 hours.

The Federal Reserve's current annual burden for Regulation E disclosures is estimated to be 63,047 hours. The final rule will increase the total burden under Regulation E for all Federal Reserve-regulated institutions by 20,704 hours, from 63,047 to 83,751 hours. (This burden estimate does not include the burden associated with the new disclosure requirements in connection with payroll card accounts as announced in a separate interim final rule (Docket No. R-1247).) Using the methodology explained above, the final rule would increase total burden under Regulation E for all other financial institutions by approximately 928,096 hours.

Because the records would be maintained by the institutions and the notices are not provided to the Federal Reserve, no issue of confidentiality arises under the Freedom of Information Act.

**Text of Final Revisions**

Comments are numbered to comply with **Federal Register** publication rules.

**List of Subjects in 12 CFR Part 205**

Consumer protection, Electronic fund transfers, Federal Reserve System, Reporting and recordkeeping requirements.

For the reasons set forth in the preamble, the Board amends 12 CFR part 205 and the Official Staff Commentary, as follows:

**PART 205 – ELECTRONIC FUND TRANSFERS (REGULATION E)**

1. The authority citation for part 205 continues to read as follows:

**Authority**:  15 U.S.C. 1693b.

2. Section 205.3 is amended by revising paragraph (a), redesignating paragraph (b) as paragraph (b)(1), revising paragraph (b)(1), and adding new paragraphs (b)(2) and (b)(3) as follows:

**§ 205.3 Coverage**

(a) <u>General</u>. This part applies to any electronic fund transfer that authorizes a financial institution to debit or credit a consumer's account.  Generally, this part applies to financial institutions.  For purposes of §§ 205.3(b)(2), 205.10(b), (d), and (e) and 205.13, this part applies to any person.

(b) <u>Electronic fund transfer</u> – (1) <u>Definition</u>.  The term electronic fund transfer means any transfer of funds that is initiated through an electronic terminal, telephone, computer, or magnetic tape for the purpose of ordering, instructing, or authorizing a financial institution to debit or credit a consumer's account.  The term includes, but is not limited to –

(i) Point-of-sale transfers;

(ii) Automated teller machine transfers;

(iii) Direct deposits or withdrawals of funds;

(iv) Transfers initiated by telephone; and

(v) Transfers resulting from debit card transactions, whether or not initiated through an electronic terminal.

(2) <u>Electronic fund transfer using information from a check</u>.  (i) This part applies where a check, draft, or similar paper instrument is used as a source of information to initiate a one-time electronic fund transfer from a consumer's account.  The consumer must authorize the transfer.

(ii) The person that initiates an electronic fund transfer using the consumer's check as a source of information for the transfer shall provide a notice that the transaction will or may be processed as an EFT, and obtain a consumer's authorization for each transfer.  A consumer authorizes a one-time electronic fund transfer (in providing a check to a merchant or other payee for the MICR encoding, that is, the routing number of the financial institution, the consumer's account number and the serial number) when the consumer receives notice and goes forward with the transaction.  For point-of-sale transfers, the notice must be posted in a prominent and conspicuous location, and a copy of the notice must be provided to the consumer at the time of the transaction.

(iii) The person that initiates an electronic fund transfer using the consumer's check as a source of information for the transfer shall also provide a notice to the consumer at the same time it provides the notice required under paragraph (b)(2)(ii) that when a check is used to initiate an electronic fund transfer, funds may be debited from the consumer's account as soon as the same day payment is received, and, as applicable, that the consumer's check will not be returned by the financial institution holding the consumer's account.  For point-of-sale transfers, the person initiating the transfer may post the notice required in this paragraph (b)(2)(iii) in a prominent and conspicuous location and need not include this notice on the copy of the notice given to the consumer under paragraph (b)(2)(ii).  The requirements in this paragraph (b)(2)(iii) shall remain in effect until December 31, 2009.

(iv) A person may provide notices that are substantially similar to those set forth in Appendix A-6 to comply with the requirements of this paragraph (b)(2).

(3) <u>Collection of service fees via electronic fund transfer</u>.  A consumer authorizes a one-time electronic fund transfer from the consumer's account to pay a fee for the return of an electronic fund transfer or a check unpaid due to insufficient or uncollected funds in the consumer's account, when the consumer receives a notice stating that the fee will be collected by an electronic fund transfer from the consumer's account, along with a disclosure of the amount of the fee, and the consumer goes forward with the transaction.  If the service fee for insufficient or uncollected funds may be collected in connection with a point-of-sale transfer, the notice must be posted in a prominent and conspicuous location, and a copy of the notice must be provided to the consumer at the time of the transaction.

* * * * *

4.  Section 205.7 is amended by adding a new paragraph (c) as follows:

**§ 205.7 Initial disclosures**

* * * * *

(c)  Addition of electronic fund transfer services.  If an electronic fund transfer service is added to a consumer's account and is subject to terms and conditions different from those described in the initial disclosures, disclosures for the new service are required.

5.  Section 205.16 is amended by revising paragraph (c) as follows:

**§ 205.16 Disclosures at automated teller machines**

* * * * *

(c) Notice requirement.  To meet the requirements of paragraph (b) of this section, an automated teller machine operator must comply with the following:

(1) On the machine.  Post in a prominent and conspicuous location on or at the automated teller machine a notice that:

(i) A fee will be imposed for providing electronic fund transfer services or for a balance inquiry; or

(ii) A fee may be imposed for providing electronic fund transfer services or for a balance inquiry, but the notice in this paragraph (c)(1)(ii) may be substituted for the notice in paragraph (c)(1)(i) only if there are circumstances under which a fee will not be imposed for such services; and

(2)  Screen or paper notice.  Provide the notice required by paragraphs (b)(1) and (b)(2) of this section either by showing it on the screen of the automated teller machine or by providing it on paper, before the consumer is committed to paying a fee.

* * * * *

6. In Appendix A to Part 205,

a. In A-2 MODEL CLAUSES FOR INITIAL DISCLOSURES (§ 205.7(b)), paragraphs (a), (b) and (d) are revised;

b. In A-3 MODEL FORMS FOR ERROR RESOLUTION NOTICE (§§ 205.7(b)(10) and 205.8(b)), paragraph (a) is republished, and paragraph (b) is added;

c. Appendix A-6 MODEL CLAUSES FOR AUTHORIZING ONE-TIME ELECTRONIC FUND TRANSFER USING INFORMATION FROM A CHECK (§ 205.3(b)(2)) is added.

**APPENDIX A TO PART 205 – MODEL DISCLOSURE CLAUSES AND FORMS**

\* \* \* \* \*

## A-2 – MODEL CLAUSES FOR INITIAL DISCLOSURES (§ 205.7(b))

(a) Consumer Liability (§ 205.7(b)(1)).

    (Tell us AT ONCE if you believe your [card] [code] has been lost or stolen, or if you believe that an electronic fund transfer has been made without your permission using information from your check.  Telephoning is the best way of keeping your possible losses down.  You could lose all the money in your account (plus your maximum overdraft line of credit).  If you tell us within 2 business days after you learn of the loss or theft of your [card] [code], you can lose no more than $50 if someone used your [card][code] without your permission.)

    If you do NOT tell us within 2 business days after you learn of the loss or theft of your [card] [code], and we can prove we could have stopped someone from using your [card] [code] without your permission if you had told us, you could lose as much as $500.

    Also, if your statement shows transfers that you did not make, including those made by card, code or other means, tell us at once.  If you do not tell us within 60 days after the statement was mailed to you, you may not get back any money you lost after the 60 days if we can prove that we could have stopped someone from taking the money if you had told us in time.  If a good reason (such as a long trip or a hospital stay) kept you from telling us, we will extend the time periods.

(b) Contact in event of unauthorized transfer (§ 205.7(b)(2)).  If you believe your [card] [code] has been lost or stolen, call:

    [Telephone number]
    or write:
    [Name of person or office to be notified]
    [Address]

You should also call the number or write to the address listed above if you believe a transfer has been made using the information from your check without your permission.

\* \* \* \* \*

(d) Transfer types and limitations (§ 205.7(b)(4))—(1) Account access. You may use your [card][code] to:

(i) Withdraw cash from your [checking] [or] [savings] account.

(ii) Make deposits to your [checking] [or] [savings] account.

(iii) Transfer funds between your checking and savings accounts whenever you request.

(iv) Pay for purchases at places that have agreed to accept the [card] [code].

(v) Pay bills directly [by telephone] from your [checking] [or] [savings] account in the amounts and on the days you request.

Some of these services may not be available at all terminals.

(2) Electronic check conversion. You may authorize a merchant or other payee to make a one-time electronic payment from your checking account using information from your check to:

(i) Pay for purchases.

(ii) Pay bills.

(3) Limitations on frequency of transfers—(i) You may make only [insert number, e.g., 3] cash withdrawals from our terminals each [insert time period, e.g., week].

(ii) You can use your telephone bill-payment service to pay [insert number] bills each [insert time period] [telephone call].

(iii) You can use our point-of-sale transfer service for [insert number] transactions each [insert time period].

(iv) For security reasons, there are limits on the number of transfers you can make using our [terminals] [telephone bill-payment service] [point-of-sale transfer service].

(4) Limitations on dollar amounts of transfers—(i) You may withdraw up to [insert dollar amount] from our terminals each [insert time period] time you use the [card] [code].

(ii) You may buy up to [insert dollar amount] worth of goods or services each [insert time period] time you use the [card] [code] in our point-of-sale transfer service.

* * * * *

**A-3 MODEL FORMS FOR ERROR RESOLUTION NOTICE (§§ 205.7(b)(10) and 205.8(b))**

(a) Initial and annual error resolution notice (§§ 205.7(b)(10) and 205.8(b)).

In Case of Errors or Questions About Your Electronic Transfers
Telephone us at [insert telephone number], or
Write us at [insert address]
[or
E-mail us at [insert electronic mail address]]

as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer listed on the statement or receipt.  We must hear from you no later than 60 days after we sent the FIRST statement on which the problem or error appeared.

(1) Tell us your name and account number (if any).

(2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information.

(3) Tell us the dollar amount of the suspected error.

If you tell us orally, we may require that you send us your complaint or question in writing within 10 business days.

We will determine whether an error occurred within 10 business days after we hear from you and will correct any error promptly.  If we need more time, however, we may take up to 45 days to investigate your complaint or question.  If we decide to do this, we will credit your account within 10 business days for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation.  If we ask you to put your complaint or question in writing and we do not receive it within 10 business days, we may not credit your account.

For errors involving new accounts, point-of-sale, or foreign-initiated transactions, we may take up to 90 days to investigate your complaint or question.  For new accounts, we may take up to 20 business days to credit your account for the amount you think is in error.

We will tell you the results within three business days after completing our investigation. If we decide that there was no error, we will send you a written explanation.  You may ask for copies of the documents that we used in our investigation.

(b) Error resolution notice on periodic statements (§ 205.8(b)).

In Case of Errors or Questions About Your Electronic Transfers
Telephone us at [insert telephone number] or
Write us at [insert address]

as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt.  We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

(1) Tell us your name and account number (if any).

(2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information.

(3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days to do this, we will credit your account for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation.

* * * * *

## A-6—MODEL CLAUSES FOR AUTHORIZING ONE-TIME ELECTRONIC FUND TRANSFERS USING INFORMATION FROM A CHECK (§ 205.3(b)(2))

<u>(a) – Notice About Electronic Check Conversion</u>

When you provide a check as payment, you authorize us either to use information from your check to make a one-time electronic fund transfer from your account or to process the payment as a check transaction.

[You authorize us to collect a fee of $ ___ through an electronic fund transfer from your account if your payment is returned unpaid.]

<u>(b) – Alternative Notice About Electronic Check Conversion (Optional)</u>

When you provide a check as payment, you authorize us to use information from your check to make a one-time electronic fund transfer from your account. In certain circumstances, such as for technical or processing reasons, we may process your payment as a check transaction. <u>[Specify other circumstances (at payee's option).]</u>

[You authorize us to collect a fee of $ ___ through an electronic fund transfer from your account if your payment is returned unpaid.]

<u>(c) – Notice For Providing Additional Information About Electronic Check Conversion</u>

When we use information from your check to make an electronic fund transfer, funds may be withdrawn from your account as soon as the same day [you make] [we receive] your payment[, and you will not receive your check back from your financial institution].

7. In Supplement I to Part 205, the following amendments are made:

a. Under <u>Section 205.2 – Definitions</u>, under <u>2(a) Access Device</u>, paragraph 2. is revised;

b. Under <u>Section 205.3 – Coverage</u>, under <u>3(b) Electronic Fund Transfer</u>, a new heading "Paragraph 3(b)(1) – Definition" is added, paragraphs 1. and 2. are redesignated as paragraphs 3(b)(1)1 and 3(b)(1)2, and paragraph 3. is removed;

c. Under <u>Section 205.3 – Coverage</u>, under <u>3(b) Electronic Fund Transfer</u>, under Paragraph 3(b)(1) – Definition, paragraph 2.iv. is added;

d. Under <u>Section 205.3 – Coverage</u>, under <u>3(b) Electronic Fund Transfer</u>, a new heading "Paragraph 3(b)(2) – Electronic Fund Transfer Using Information From a Check" is added, and paragraphs 1. through 5. are added;

e. Under <u>Section 205.3 – Coverage</u>, under <u>3(b) Electronic Fund Transfer</u>, a new heading "Paragraph 3(b)(3) – Collection of Service Fees via Electronic Fund Transfer" is added, and paragraph 1. is added;

f. Under <u>Section 205.3 – Coverage</u>, under <u>3(c) Exclusions from coverage</u>, under heading Paragraph 3(c)(1) – Checks, paragraphs 1. and 2. are revised;

g. Under <u>Section 205.5 – Issuance of Access Devices</u>, under <u>5(a) Solicited Issuance</u>, under Paragraph 5(a)(2), paragraph 1. is revised;

h. Under <u>Section 205.5 – Issuance of Access Devices</u>, under <u>5(b) Unsolicited Issuance</u>, paragraph 5. is added;

i. Under <u>Section 205.7 – Initial Disclosures</u>, under <u>7(a) Timing of Disclosures</u>, paragraph 1. is revised, paragraph 4. is removed, and paragraphs 5. and 6. are redesignated as paragraphs 4. and 5.;

j. Under <u>Section 205.7 – Initial Disclosures</u>, under <u>7(b) Content of Disclosures</u>, under Paragraph 7(b)(4) – Types of Transfers; Limitations, paragraph 4. is added;

k. Under <u>Section 205.7 – Initial Disclosures</u>, a new heading "<u>7(c) Addition of Electronic Fund Transfer Services</u>" is added, and paragraph 1. is added;

l. Under <u>Section 205.10 – Preauthorized Transfers</u>, under <u>10(b) Written Authorization for Preauthorized Transfers from Consumer's Account</u>, paragraphs 3. and 7. are revised;

m. Under <u>Section 205.10 – Preauthorized Transfers</u>, under <u>10(c) Consumer's Right to Stop Payment</u>, paragraph 2. is revised, and paragraph 3. is added;

n. Under <u>Section 205.10 – Preauthorized Transfers</u>, under <u>10(d) Notice of Transfers Varying in Amount</u>, under Paragraph 10(d)(2) – Range, paragraph 2. is added;

o. Under <u>Section 205.11 – Procedures for Resolving Errors</u>, under <u>11(b) Notice of Error from Consumer</u>, under Paragraph 11(b)(1) – Timing; Contents, paragraph 7. is added;

p. Under <u>Section 205.11 – Procedures for Resolving Errors</u>, under <u>11(c) Time Limits and Extent of Investigation</u>, under Paragraph 11(c)(4) – Investigation, paragraph 5. is added; and

q. Under <u>Section 205.16 – Disclosures at Automated Teller Machines</u>, under <u>16(b) General</u>, under Paragraph 16(b)(1), paragraph 1. is revised.

**SUPPLEMENT I TO PART 205 – OFFICIAL STAFF INTERPRETATIONS**

* * * * *

Section 205.2 – Definitions

    2(a) Access Device

* * * * *

    2. Checks used to capture information.  The term "access device" does not include a check or draft used to capture the MICR (Magnetic Ink Character Recognition) encoding to initiate a one-time ACH debit.  For example, if a consumer authorizes a one-time ACH debit from the consumer's account using a blank, partially completed, or fully completed and signed check for the merchant to capture the routing, account, and serial numbers to initiate the debit, the check is not an access device.  (Although the check is not an access device under Regulation E, the transaction is nonetheless covered by the regulation.  See comment 3(b)(1)-1.v.)

* * * * *

Section 205.3 – Coverage

* * * * *

    3(b) Electronic Fund Transfer

    Paragraph 3(b)(1) – Definition

* * * * *

    2. Fund transfers not covered.  The term "electronic fund transfer" does not include –

    * * *

    iv. Transactions arising from the electronic collection, presentment, or return of checks through the check collection system, such as through transmission of electronic check images.

    Paragraph 3(b)(2) – Electronic Fund Transfer Using Information From a Check

    1. Notice at POS not furnished due to inadvertent error.  If the copy of the notice under section 205.3(b)(2)(ii) for ECK transactions is not provided to the consumer at POS because of a bona fide unintentional error, such as when a terminal printing mechanism jams, no violation results if the payee maintains procedures reasonably adapted to avoid such occurrences.

    2. Authorization to process a transaction as an EFT or as a check.  In order to process a transaction as an EFT or alternatively as a check, the payee must obtain the consumer's

authorization to do so.  A payee may, at its option, specify the circumstances under which a check may not be converted to an EFT.  (See model clauses in Appendix A-6.)

3.  <u>Notice for each transfer</u>.  Generally, a notice to authorize an electronic check conversion transaction must be provided for each transaction.  For example, a consumer must receive a notice that the transaction will be processed as an EFT for each transaction at POS or each time a consumer mails a check in an accounts receivable (ARC) transaction to pay a bill, such as a utility bill, if the payee intends to convert a check received as payment.  Similarly, the consumer must receive notice if the payee intends to collect a service fee for insufficient or uncollected funds via an EFT for each transaction whether at POS or if the consumer mails a check to pay a bill.  The notice about when funds may be debited from a consumer's account and the non-return of consumer checks by the consumer's financial institution must also be provided for each transaction.  However, if in an ARC transaction, a payee provides a coupon book to a consumer, for example, for mortgage loan payments, and the payment dates and amounts are set out in the coupon book, the payee may provide a single notice on the coupon book stating all of the required disclosures under paragraph (b)(2) of this section in order to obtain authorization for each conversion of a check and any debits via EFT to the consumer's account to collect any service fees imposed by the payee for insufficient or uncollected funds in the consumer's account.  The notice must be placed on a conspicuous location of the coupon book that a consumer can retain – for example, on the first page, or inside the front cover.

4.  <u>Multiple payments/multiple consumers</u>.  If a merchant or other payee will use information from a consumer's check to initiate an EFT from the consumer's account, notice to a consumer listed on the billing account that a check provided as payment during a single billing cycle or after receiving an invoice or statement will be processed as a one-time EFT or as a check transaction constitutes notice for all checks provided in payment for the billing cycle or the invoice for which notice has been provided, whether the check(s) is submitted by the consumer or someone else.  The notice applies to all checks provided in payment for the billing cycle or invoice until the provision of notice on or with the next invoice or statement.  Thus, if a merchant or other payee receives a check as payment for the consumer listed on the billing account after providing notice that the check will be processed as a one-time EFT, the authorization from that consumer constitutes authorization to convert any other checks provided for that invoice or statement.  Other notices required under this paragraph (b)(2) (for example, to collect a service fee for insufficient or uncollected funds via an EFT) provided to the consumer listed on the billing account also constitutes notice to any other consumer who may provide a check for the billing cycle or invoice.

5.  <u>Additional disclosures about ECK transactions at POS</u>.  When a payee initiates an EFT at POS using information from the consumer's check, and returns the check to the consumer at POS, the payee need not provide a notice to the consumer that the check will not be returned by the consumer's financial institution.

Paragraph 3(b)(3) – Collection of Service Fees via Electronic Fund Transfer

1.  <u>Fees imposed by account-holding institution</u>.  The requirement to obtain a consumer's authorization at POS to collect a fee via EFT for the return of an EFT or check unpaid due to

insufficient or uncollected funds in the consumer's account does not apply to fees assessed against the consumer's account by the consumer's account-holding institution for the return of an EFT or a check unpaid or for paying overdrafts.

* * * * *

    <u>3(c) Exclusions from Coverage</u>

    Paragraph 3(c)(1) – Checks

    1.  <u>Re-presented checks</u>.  The electronic re-presentment of a returned check is not covered by Regulation E because the transaction originated by check.  Regulation E does apply, however, to any fee debited via an EFT from a consumer's account by the payee because the check was returned for insufficient or uncollected funds.  The person debiting the fee electronically must obtain the consumer's authorization.

    2.  <u>Check used to capture information for a one-time EFT</u>.  See comment 3(b)(1)-1.v.

* * * * *

Section 205.5 – Issuance of Access Devices

* * * * *

    <u>5(a) Solicited Issuance</u>

* * * * *

    Paragraph 5(a)(2)

    1.  <u>One-for-one rule</u>.  In issuing a renewal or substitute access device, only one renewal or substitute device may replace a previously issued device.  For example, only one new card and PIN may replace a card and PIN previously issued.  A financial institution may provide additional devices at the time it issues the renewal or substitute access device, however, provided the institution complies with § 205.5(b).  (See comment 5(b)-5.)  If the replacement device or the additional device permits either fewer or additional types of electronic fund transfer services, a change-in-terms notice or new disclosures are required.

* * * * *

    <u>5(b) Unsolicited Issuance</u>

* * * * *

    5.  <u>Additional access devices in a renewal or substitution</u>.  A financial institution may issue more than one access device in connection with the renewal or substitution of a previously

issued accepted access device, provided that any additional access device (beyond the device replacing the accepted access device) is not validated at the time it is issued, and the institution complies with the other requirements of § 205.5(b). The institution may, if it chooses, set up the validation procedure such that both the device replacing the previously issued device and the additional device are not validated at the time they are issued, and validation will apply to both devices. If the institution sets up the validation procedure in this way, the institution should provide a clear and readily understandable disclosure to the consumer that both devices are unvalidated and that validation will apply to both devices.

* * * * *

Section 205.7 – Initial Disclosures

  7(a) Timing of Disclosures

  1. Early disclosures. Disclosures given by a financial institution earlier than the regulation requires (for example, when the consumer opens a checking account) need not be repeated when the consumer later enters into an agreement with a third party to initiate preauthorized transfers to or from the consumer's account, unless the terms and conditions differ from those that the institution previously disclosed. This interpretation also applies to any notice provided about one-time EFTs from a consumer's account initiated using information from the consumer's check. On the other hand, if an agreement for EFT services to be provided by an account-holding institution is directly between the consumer and the account-holding institution, disclosures must be given in close proximity to the event requiring disclosure, for example, when the consumer contracts for a new service.

* * * * *

  7(b) Content of Disclosures

* * * * *

  Paragraph 7(b)(4) – Types of Transfers; Limitations

* * * * *

  4. One-time EFTs initiated using information from a check. Financial institutions must disclose the fact that one-time EFTs initiated using information from a consumer's check are among the types of transfers that a consumer can make. (See Appendix A-2.)

* * * * *

  7(c) Addition of Electronic Fund Transfer Services

1. <u>Addition of electronic check conversion services</u>.  One-time EFTs initiated using information from a consumer's check are a new type of transfer requiring new disclosures, as applicable.  (See Appendix A-2.)

* * * * *

Section 205.10 – Preauthorized Transfers

* * * * *

<u>10(b) Written Authorization for Preauthorized Transfers from Consumer's Account</u>

* * * * *

3. <u>Written authorization for preauthorized transfers</u>.  The requirement that preauthorized EFTs be authorized by the consumer "only by a writing" cannot be met by a payee's signing a written authorization on the consumer's behalf with only an oral authorization from the consumer.

* * * * *

7. <u>Bona fide error</u>.  Consumers sometimes authorize third-party payees, by telephone or on-line, to submit recurring charges against a credit card account.  If the consumer indicates use of a credit card account when in fact a debit card is being used, the payee does not violate the requirement to obtain a written authorization if the failure to obtain written authorization was not intentional and resulted from a bona fide error, and if the payee maintains procedures reasonably adapted to avoid any such error.  Procedures reasonably adapted to avoid error will depend upon the circumstances.  Generally, requesting the consumer to specify whether the card to be used for the authorization is a debit (or check) card or a credit card is a reasonable procedure.  Where the consumer has indicated that the card is a credit card (or that the card is not a debit or check card), the payee may rely on the consumer's statement without seeking further information about the type of card.  If the payee believes, at the time of the authorization, that a credit card is involved, and later finds that the card used is a debit card (for example, because the consumer later brings the matter to the payee's attention), the payee must obtain a written and signed or (where appropriate) a similarly authenticated authorization as soon as reasonably possible, or cease debiting the consumer's account.

<u>10(c) Consumer's Right to Stop Payment</u>

* * * * *

2. <u>Revocation of authorization</u>.  Once a financial institution has been notified that the consumer's authorization is no longer valid, it must block all future payments for the particular debit transmitted by the designated payee-originator.  (However, see comment 10(c)-3.)  The institution may not wait for the payee-originator to terminate the automatic debits.  The institution may confirm that the consumer has informed the payee-originator of the revocation

(for example, by requiring a copy of the consumer's revocation as written confirmation to be provided within 14 days of an oral notification).  If the institution does not receive the required written confirmation within the 14-day period, it may honor subsequent debits to the account.

      3.  <u>Alternative procedure for processing a stop-payment request</u>.  If an institution does not have the capability to block a preauthorized debit from being posted to the consumer's account – as in the case of a preauthorized debit made through a debit card network or other system, for example – the institution may instead comply with the stop-payment requirements by using a third party to block the transfer(s), as long as the consumer's account is not debited for the payment.

      <u>10(d) Notice of Transfers Varying in Amount</u>

* * * * *

      Paragraph 10(d)(2) – Range

* * * * *

      2.  <u>Transfers to an account of the consumer held at another institution</u>.  A financial institution need not provide a consumer the option of receiving notice with each varying transfer, and may instead provide notice only when a debit to an account of the consumer falls outside a specified range or differs by more than a specified amount from the most recent transfer, if the funds are transferred and credited to an account of the consumer held at another financial institution.  The specified range or amount, however, must be one that reasonably could be anticipated by the consumer, and the institution must notify the consumer of the range or amount at the time the consumer provides authorization for the preauthorized transfers.  For example, if the transfer is for payment of interest for a fixed-rate certificate of deposit account, an appropriate range might be based on a month containing 28 days and a month containing 31 days.

* * * * *

Section 205.11 – Procedures for Resolving Errors

* * * * *

      <u>11(b) Notice of Error from Consumer</u>

      Paragraph 11(b)(1) – Timing; Contents

* * * * *

      7.  <u>Effect of late notice</u>.  An institution is not required to comply with the requirements of this section for any notice of error from the consumer that is received by the institution later than 60 days from the date on which the periodic statement first reflecting the error is sent.  Where the

consumer's assertion of error involves an unauthorized EFT, however, the institution must comply with § 205.6 before it may impose any liability on the consumer.

* * * * *

<u>11(c) Time Limits and Extent of Investigation</u>

* * * * *

Paragraph 11(c)(4) – Investigation

* * * * *

5. <u>No EFT agreement</u>.  When there is no agreement between the institution and the third party for the type of EFT involved, the financial institution must review any relevant information within the institution's own records for the particular account to resolve the consumer's claim. The extent of the investigation required may vary depending on the facts and circumstances. However, a financial institution may not limit its investigation solely to the payment instructions where additional information within its own records pertaining to the particular account in question could help to resolve a consumer's claim.

Information that may be reviewed as part of an investigation might include:

i.  The ACH transaction records for the transfer;

ii.  The transaction history of the particular account for a reasonable period of time immediately preceding the allegation of error;

iii.  Whether the check number of the transaction in question is notably out-of-sequence;

iv.  The location of either the transaction or the payee in question relative to the consumer's place of residence and habitual transaction area;

v.  Information relative to the account in question within the control of the institution's third-party service providers if the financial institution reasonably believes that it may have records or other information that could be dispositive; or

vi.  Any other information appropriate to resolve the claim.

* * * * *

Section 205.16 – Disclosures on Automated Teller Machines

<u>16(b) – General</u>

Paragraph 16(b)(1)

1.  <u>Specific notices</u>.  An ATM operator that imposes a fee for a specific type of transaction – such as for a cash withdrawal, but not for a balance inquiry, or for some cash withdrawals, but not for others (such as where the card was issued by a foreign bank or by a card issuer that has entered into a special contractual relationship with the ATM operator regarding surcharges) – may provide a notice on or at the ATM that a fee will be imposed or a notice that a fee may be imposed for providing EFT services or may specify the type of EFT for which a fee is imposed.  If, however, a fee will be imposed in all instances, the notice must state that a fee will be imposed.

By order of the Board of Governors of the Federal Reserve System, December 30, 2005.


<u>Jennifer J. Johnson (signed)</u>
Jennifer J. Johnson,
Secretary of the Board.